IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Leigha Lemoine, | ) | CASE NO.: 4:24-cv-06032-JD |
|         Plaintiff, | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Horry Georgetown Technical College, et al., | ) | |
|         Defendants. | ) | |

This is a constitutional challenge to a suspension and no-trespassing order by a state technical college. Before the Court is Plaintiff Leigha Lemoine's emergency motion for a temporary restraining order or, alternatively, a preliminary injunction. (DE 5.) For the reasons set forth below, this motion is granted.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   Lemoine's Snapchat Message

In September 2024, Leigha Lemoine ("Lemoine") was enrolled in the cosmetology program at Defendant Horry Georgetown Technical College ("HGTC"). (DE 5 at 2–3.) On September 5, 2024, while Lemoine was off-campus, Lemoine's boyfriend's roommate—who was not an HGTC student—insulted Lemoine. (*Id*. at 3.) Later that day, Lemoine detailed the incident in a Snapchat group text that included other HGTC students. (*Id*.) Therein, Lemoine posted the following:

> But naw I was trying to be nice but f[***] that some random ugly a[**] in bread looking f[***] dude called me a b[****] he needa get blasted.

(DE 5-2 at 1.) (Hereafter, the "Snapchat.")

On September 11, 2024, some students at HGTC reported that they "fe[lt] uncomfortable and somewhat unsafe" due to Lemoine's use of "the term 'blasted'" in the Snapchat. (DE 5-1 at 1.) That same day, Lemoine met with Dr. Melissa Batten ("Batten") and Dr. Kristin Sawyer ("Sawyer"), the Vice President of Student Affairs and Director of Student Development, respectively, at HGTC. (DE 5 at 4.)

At the September 11, 2024, meeting, Batten and Sawyer asked Lemoine "to share [her] perspectives" about the Snapchat. (DE 5-1 at 1.) Lemoine "denied it having anything to do with physical harm" and only intended that the roommate "needed to be held accountable and called out for his behavior." (*Id.*) Defendants accepted Lemoine's explanation. (*Id.*)

### 2. HGTC's Discovery of Lemoine's One-Year-Old Instagram Video

On September 13, 2024, HGTC discovered a one-year-old video of Lemoine posted on Instagram, in which Lemoine fired a handgun at a target. (DE 5-1 at 1; *see* DE 5-4 at 1.) While firing the handgun, Lemoine was "wearing a western[-]style outfit . . . ." (DE 1 at 2.) Four days later, on September 17, 2024, Lemoine again met with HGTC personnel. (DE 5-1 at 2.) At this meeting, Lemoine was placed on an "interim suspension" (*id.*) and received a letter signed by Batten purporting to serve as "a No Trespass notification." (DE 5-3 at 1.) During the meeting, Lemoine explained that the gun in the video "did not belong" to her and she had never fired a gun before that time. (DE 5-1 at 2.) Lemoine also deleted the video during the meeting. (DE 1 at 10.)

Sometime thereafter, Batten and Sawyer interviewed other HGTC professors "to gather additional information about the learning environment in the Cosmetology program." (DE 5-1 at 2.) On September 18, 2024, Lemoine again met with Sawyer. (*Id.*)

### 3.  Lemoine's Suspension

In a letter dated September 20, 2024, Sawyer informed Lemoine that she was suspended until "Fall Semester of 2025," at which time Lemoine would be on "disciplinary probation." (*Id.* at 3.) The letter also set forth a process for appeal. (*Id.*) Sawyer described the basis for HGTC's decision as resting on "infringement of the rights of others" as set forth in the Student Code for the South Carolina Technical College System (the "Code").[1]

Specifically, Sawyer wrote that "[i]n today's climate," Lemoine's "failure to disclose the existence of the video" and "use of the term 'blasted'" created "a significant amount of apprehension related to the presence and use of guns" and that "both employees and students" at HGTC "feel unsafe due to these circumstances." (DE 5-1 at 2.) Lemoine appealed timely. (DE 5 at 7.)

### 4.  Lemoine's Appeal

On October 10, 2024, the "Hearing Committee" affirmed Sawyer's decision, but reduced the term of Lemoine's suspension from Fall 2025 to Summer 2025. (*See* DE 5-5 at 1.) During the hearing, Batten stated that neither the Snapchat "on its own,"

---

[1]    This provision of the Code prohibits "[e]ngaging in any activity that disrupts the educational process of the college, interferes with the rights of others, or adversely interferes with other normal functions and services." (DE 5-1 at 2.)

nor "the year[-]old Instagram video post depicting Plaintiff target practicing at a friend's private property, on its own," violated the Code. (DE 5 at 7.) In its decision, unlike Sawyer's original decision, the Hearing Committee permitted Lemoine to attend classes online. (*Id.*) The letter also explained the next step of the administrative appeal process. (*Id.*)

**B.    Procedural Background**

On October 23, 2024, Lemoine filed her complaint in this Court. (DE 1.) In it, Lemoine sues HGTC directly as well as:

- Marilyn Murphy Fore, Ed.D., in her individual and official capacity as president of HGTC;

- Melissa Batten, Ph.D., in her individual and official capacity as vice president of student affairs at HGTC;

- Kristin Sawyer, Ed.D., in her individual and official capacity as director of student development at HGTC; and

- Two fictitious defendants in both their individual and official capacities who represent as-yet unknown "administrators, instructors, and/or other personnel at HGTC" who decided to suspend Lemoine.

(*See* DE 5 at 1; *id.* at 6.) Lemoine asserts under 42 U.S.C. § 1983 that HGTC and the named defendants have retaliated against and infringed upon her protected speech as well as violated her due process rights, all under the First and Fourteenth Amendments. (*See generally* DE 1.)

Two days later, Lemoine filed her emergency motion for injunctive relief. (DE 5.) In it, Lemoine contends she is entitled to a temporary restraining order or preliminary injunction that enjoins Defendants "from enforcing HGTC's one[-]year suspension of [Lemoine] from HGTC and [the] accompanying no[-]trespass order";

and that "require[es] HGTC to readmit [Lemoine] to HGTC's Cosmetology Program . . . ." (*Id.* at 1.) Lemoine presses that she will suffer irreparable harm because of the suspension and no-trespass order because she cannot complete the cosmetology program without attending in-person classes. (DE 5 at 7 & n.2; DE 1 at 18.)

Lemoine asserts that the Code is unconstitutionally vague and overbroad. (DE 1 at 18.) Lemoine also presses that Defendants:

- suspended Lemoine in retaliation for her exercising her First Amendment rights;
- unconstitutionally applied the Code to Lemoine's protected speech; and
- denied Lemoine's liberty and property right in her education without providing all the process Lemoine was due.

(DE 5 at 2.) On October 31, 2024, the Court held a status conference. After the conference, the Court set forth a briefing schedule with all responses and replies due by November 21, 2024.[2] (DE 7.)

## II.    STANDARD

Rule 52(a)(2), Fed. R. Civ. P., provides that "[i]n granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action." Rule 65, Fed. R. Civ. P., establishes the procedure for federal courts to grant preliminary injunctions. "A preliminary injunction is an extraordinary

---

[2]    On November 18, 2024, in response to Lemoine's contention that Defendants "waived" certain arguments (*see* DE 12 at 8), Defendants filed a motion to file a "sur-reply." (DE 13.) Lemoine opposes the motion. (DE 14.) The Court grants Defendants' motion for leave to file the sur-reply.

remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).

A plaintiff seeking a preliminary injunction must establish all four of the following criteria:

(1) that he is likely to succeed on the merits,

(2) that he is likely to suffer irreparable harm in the absence of preliminary injunctive relief,

(3) that the balance of equities tips in his favor, and

(4) that the injunction is in the public interest.

*League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

A plaintiff must make a clear showing that he is likely to succeed on the merits of his claim. *Winter*, 555 U.S. at 20–22. Likewise, a plaintiff must make a clear showing that he is likely to be irreparably harmed absent injunctive relief. *Id.* Only then may the court proceed to consider whether the balance of equities tips in the plaintiff's favor and then consider the public consequences of employing the extraordinary relief of injunction. *League of Women Voters of N.C.*, 769 F.3d at 250 (Motz. J., dissenting); *Williams Ohio Valley Midstream, LLC v. Kittle*, No. 23-2185, 2024 WL 3325532, at *3 (4th Cir. July 8, 2024) (noting that "[e]ach preliminary injunction factor must be 'satisfied as articulated'").

### III.   DISCUSSION

A.   **Lemoine Is Entitled to a Preliminary Injunction**

As observed above, Lemoine presses several claims under the First and Fourteenth Amendments. Because the Court concludes that a clear showing of a likelihood of success on the merits exists as to Lemoine's retaliation claim, the Court does not reach Lemoine's other claims.

To state a claim under 42 U.S.C. § 1983, Lemoine must establish "that [Defendants] deprived [Lemoine] of a right secured by the Constitution and laws of the United States; and (2) that they "deprived [Lemoine] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage." *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (quotation marks omitted).

To assert a First Amendment claim for retaliation, a plaintiff must show:

(1)   "she engaged in protected First Amendment activity";

(2)   "the defendants took some action that adversely affected her First Amendment rights"; and

(3)   "there was a causal relationship between her protected activity and the defendants' conduct."

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). "[A] university may violate the First Amendment if it uses a professional code of conduct or ethics as a pretext to punish the content of a student's speech." *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 458 (W.D. Va. 2021), *aff'd*, 93 F.4th 675 (4th Cir. 2024).

It is sufficient if a defendant acts to "punish, sanction, or take adverse action against" the plaintiff's protected speech. *Suarez Corp. Indus. v. McGraw*, 202 F.3d

676, 690 (4th Cir. 2000). Of course, retaliation can be shown when the conduct of Defendants would dissuade "a person of ordinary firmness" from exercising their rights. *Constantine*, 411 F.3d at 500.

As an initial matter, there is no question that Defendants acted under color of state law by suspending Lemoine and issuing the no-trespass order pursuant to the Code. (DE 1 at 5 (alleging in verified complaint that "HGTC is headquartered and operates in Horry County, South Carolina, and is a political subdivision of the State of South Carolina").) Equally, there is no question that the Snapchat and Lemoine's Instagram video are pure speech. *Cf. Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190–91 (2021). Defendants admit that the suspension and no-trespass orders were imposed in response to the Snapchat as understood in the context of Lemoine's Instagram video. (DE 5-1 at 2.) Defendants' actions are the cause-in-fact of Lemoine's injuries. (*See* DE 5 at 3 (noting that Lemoine can no longer pursue her education in cosmetology at HGTC while suspended because she must "complete certain program specific courses that are only available on campus and in person").)

Thus, the success of Lemoine's motion turns on the protection that the First Amendment affords her speech.

### 1. Lemoine Has a Likelihood of Success on the Merits of Her Retaliation Claim Under the First Amendment

"The First Amendment prohibits Congress and, through the Fourteenth Amendment, the States from 'abridging the freedom of speech.'" *Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565, 571 (4th Cir. 2011) (quoting U.S. Const. amend I). The idea

of "freedom of speech" reflects "the usual rule that governmental bodies may not prescribe the form or content of individual expression." *Cohen v. California*, 403 U.S. 15, 24 (1971). This principle is not without limitation as speech may be unprotected if it is a "true threat." *Virginia v. Black*, 538 U.S. 343, 359 (2003). But even if speech is not unprotected by the First Amendment, "the special characteristics of the school environment" can otherwise limit protection. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The Supreme Court of the United States has recognized four "categories of student speech" that public schools may lawfully regulate, namely:

(1) "'indecent,' 'lewd,' or 'vulgar' speech uttered during a school assembly on school grounds";

(2) "speech, uttered during a class trip, that promotes 'illegal drug use'";

(3) "speech that others may reasonably perceive as 'bearing the imprimatur of the school,' such as that appearing in a school-sponsored newspaper"; and

(4) "speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'"

*Mahanoy Area Sch. Dist.*, 594 U.S. at 187–88 (alterations adopted and quoting other sources). Importantly, at least the last category in this list is not limited to student speech uttered on campus. *Id.* at 188.

### (a) The Applicable First Amendment Framework

Lemoine uttered the speech in issue here via two social media applications: Snapchat and Instagram. (DE 1 at 2.) In doing so, Lemoine spoke "away from [the] college campus." (DE 12 at 2.) Defendants contend Lemoine's speech "impacted the

learning environment" by "causing both employees and students" to "feel unsafe." (DE 10 at 2.)

Recently, the Supreme Court of the United States analyzed the features of off-campus student speech that causes "material[] disrupt[ion] [of] classwork . . . or substantial disorder or invasion of the rights of others," and whether those features justify or permit school regulation. *Mahanoy Area Sch. Dist.*, 594 U.S. at 188 (quoting *Tinker*, 393 U.S. at 513). In that case, while at a restaurant off campus, a high school student posted "F[***] school f[***] softball f[***] cheer f[***] everything" on Snapchat. *Id.* at 185. For this, the student was suspended from school and kicked off the cheerleading team. *Id.* In the student's subsequent federal lawsuit, the district court granted the student preliminary injunctive relief and later granted the school district summary judgment. *Id.* at 185–86. The Third Circuit Court of Appeals reversed, concluding that "the *Tinker* standard did not apply" because the student's speech occurred off-campus. *Id.* at 186–87.

The Supreme Court determined that the Third Circuit's categorical approach did not accord with *Tinker*'s rationale. *See Mahanoy Area Sch. Dist.*, 594 U.S. at 188–89. In this connection, the Court noted in dicta that off-campus unprotected speech—such as true threats "aimed at teachers or other students"—can obviously be regulated by the school. *Id.* at 188. The Court then identified "three features of off-campus speech" that "diminish the strength" of arguments in favor of school regulation. *Id.* at 189. Considering these features, the Court concluded that the

student-plaintiff's interests outweighed the school's and affirmed the judgment of Third Circuit. *Id.* at 191–94.

In the analogous context here, the first question is whether a likelihood exists that Lemoine's speech constituted an unprotected "true threat" such that Defendants' actions in response did not infringe upon protected speech and thus, constitute retaliation. If not, the Court must inquire whether Defendants' actions were otherwise impermissible given the First Amendment protection of Lemoine's speech and the school's interests.

### (b)     Lemoine's Off-Campus Speech Was Not a "True Threat"

Defendants contend that the Snapchat, in the light of the video of Lemoine firing a gun, was a true threat. (DE 10 at 6–7.) A "true threat" exists "where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360. To be constitutionally proscribable, the speaker must have "had some understanding of his statements' threatening character" and must have behaved with at least "recklessness" when publishing the threat. *See Counterman v. Colorado*, 600 U.S. 66, 73 (2023).

Lemoine's statement is unlikely a true threat for several reasons. First, on September 20, 2024, Defendants agreed with Lemoine's explanation that "blasted" had a completely nonviolent meaning. (DE 5-1 at 1.) If Defendants believed that use of the term "blasted" was objectively threatening, it is unlikely they would have accepted Lemoine's explanation. But even assuming that "blasted" could have been objectively threatening on September 20, 2024, Lemoine explained that she only

intended to provide commentary about a personal insult directed towards her. (DE 1 at 3 (verified complaint); *see* DE 5-1 at 1.) Thus, it does not seem—much less clearly appear—that Lemoine's "intent" in making the Snapchat was sufficiently culpable.

Second, the context of the later-discovered Instagram video likely does not support Defendants' decision. Defendants contend that the decision to suspend Lemoine was made in the full context of discovery of the video after Lemoine's "dissembling" about guns. (DE 10 at 7; *see* DE 5-1 at 1 (characterizing Lemoine's September 11, 2024, conduct as "deflect[ing] personal association with firearms").) But Defendants do not suggest that there is anything that smacks of impropriety—much less a subtle indicium of danger—about the video. Though Lemoine did not disclose the video's existence, Defendants do not contend that Lemoine affirmatively lied about or tried to hide anything that it disclosed. As Lemoine explained, the one-year-old video depicted the first—and apparently only—time that Lemoine ever fired a gun. (DE 5-1 at 2.) Lemoine also stated that the gun was not hers and that she did not see anything wrong with the video. (*Id.*) Defendants' admission that, like the Snapchat, there is nothing individually nefarious about the video, is telling. (DE 5 at 7.)

Finally, the stark difference between the context here and other cases about threats buttresses the Court's conclusion. *See, e.g.*, *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 708 (9th Cir. 2019) (off-campus journal entry discovered referring to students and school personnel with "All these People *Must* Die" and "I am *God*"); *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 619 (8th Cir. 2002) (student

wrote "two violent, misogynic, and obscenity-laden rants expressing a desire to molest, rape, and murder" his ex-girlfriend that were discovered off-campus); *Counterman*, 600 U.S. at 120 (Barrett, J., dissenting) (collecting cases); *Mahanoy Area Sch. Dist.*, 594 U.S. at 207 (Alito J., concurring) (same). Notably, Lemoine directed no threat to any student, teacher, or other personnel at HGTC. And no criminal charges have been brought against Lemoine.

Therefore, Lemoine's speech was likely not a true threat. The record lacks an indicium that Lemoine's speech was of any other unprotected class of speech. Therefore, the Snapchat, understood in the light of the Instagram video, receives at least some protection under the First Amendment. The next question is how much.

### (c) Lemoine's off-campus speech was fully protected

Defendants contend Lemoine's speech "materially and substantially interferes with the requirements of [HGTC's] mission, work, or discipline."[3] (DE 10 at 3.) To address this argument, the Court must consider the strength of First Amendment protection to which Lemoine's speech is entitled. For that, the Court turns to the Supreme Court's analysis in *Mahanoy*.

### (i) *Defendants Do Not Stand* in Loco Parentis

The Supreme Court began with the doctrine of *in loco parentis*: "*First*, a school, in relation to off-campus speech, will rarely stand *in loco parentis*." *Mahanoy Area Sch. Dist.*, 594 U.S. at 189. The Latin term "*in loco parentis*" means "[i]n the place of

---

[3] Defendants also contend that Lemoine's off-campus speech constituted "severe bullying or harassment targeting particular individuals . . . ." (DE 10 at 4 (quoting *Mahanoy Area Sch. Dist.*, 594 U.S. at 180).) However, this contention is difficult to reconcile with Defendants' initial reason for accepting Lemoine's explanation as they did.

a parent," and it applies "when [a] person undertakes care and control of another in absence of such supervision by [the] latter's natural parents." *In loco parentis*, Black's Law Dictionary (6th ed. 1991) (quoting another source).

Here, Lemoine spoke "away from" campus. (*See* DE 12 at 2.) She spoke outside of the traditional school day and did so in a non-HGTC-operated group chat. (DE 5 at 3.) These facts alone suggest HGTC did not stand *in loco parentis*. But Lemoine is also a college student. As a justification for speech regulation, *in loco parentis* has diminished force in the college context. *See Mahanoy Area Sch. Dist.*, 594 U.S. at 194 n.2 (Alito, J., concurring); *cf. Healy v. James*, 408 U.S. 169, 180 (1972) (noting that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'" (quoting another source)); *see McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 242 (3d Cir. 2010) ("Public university 'administrators are granted less leeway in regulating student speech than are public elementary or high school administrators.'" (quoting another source)). Therefore, Lemoine's speech shares decidedly in this first feature of off-campus speech.

### (ii)    *The Scope of Defendants' Regulation*

"*Second*, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day." *Mahanoy Area Sch. Dist.*, 594 U.S. at 189. For this reason, courts "must be more skeptical" of attempts to regulate such speech. *Id.* Here again, Lemoine was "away from" HGTC when she spoke, (DE 12 at 2), and Lemoine spoke in a "group text chain" that, while it included some HGTC

students, it was "outside of school owned, school operated, or school supervised channels . . . ." (DE 5 at 3.) Furthermore, Lemoine's speech occurred sometime in the "evening and into the night . . . ." (DE 5 at 4.) School regulation on these facts would sweep in much student speech. Thus, Lemoine's speech shares substantially in this feature of off-campus speech.

### (iii) *Defendants' Interest in the Protection of Unpopular Expression*

"*Third*, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Mahanoy Area Sch. Dist.*, 594 U.S. at 190. Here, Lemoine intended to hold the person who insulted her accountable. (DE 1 at 3 (verified complaint); DE 5-1 at 1.) Calling for accountability is the essence of protected speech. *Cf. United States v. Bly*, 510 F.3d 453, 459 (4th Cir. 2007). Thus, as a public school, HGTC and its personnel have an interest in protecting unpopular speech like Lemoine's. Thus, Lemoine's off-campus speech shares fully the same underlying rationales supporting limited regulation by the school.

Nonetheless, the interests of the school in regulating off-campus speech are entitled to some weight. *Mahanoy Area Sch. Dist.*, 594 U.S. at 191–93. In that regard, Defendants point only to the results of their investigation. (DE 10 at 5.) Namely that Lemoine's Snapchat purportedly "impacted the learning environment, causing both employees and students to express that they feel unsafe due to these circumstances." (*Id.*) But these undifferentiated contentions, without more, do not suggest an actual disruption occurred. *See Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th

350, 359 (6th Cir. 2023) (finding a "reasonabl[e] argu[ment] that actual disruption occurred" when a student observed "one of the targeted teachers crying in one of her classes" and there were "whisper[s] about" the purported harassment "during the day" among students). Defendants point to no evidence of any past disruption by Lemoine or any other disruptions occurring under materially similar circumstances. *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 259 n.7 (4th Cir. 2003).

As to future disruptions, the Fourth Circuit Court of Appeals has said that off-campus speech must create "a reasonably foreseeable substantial disruption" at the school. *Kowalski*, 652 F.3d at 574. In *Kowalksi*, the court of appeals found it foreseeable that speech via a MySpace group that targeted a fellow high school student for ridicule "would reach the school via computers, smartphones, and other electronic devices" because "most" of the MySpace group members were also students. *Id.* The problem is that *Kowalski* is distinguishable in two material respects: the school imposing regulation was a high school, not a college, and the speech in issue there was about a fellow student, not a non-student. These facts about Lemoine's speech diminish the reasonableness of any concern about a disruption (much less a substantial one) occasioned by Lemoine's speech. *Cf. Mahanoy Area Sch. Dist.*, 594 U.S. at 194 (Alito, J., concurring).

Therefore, Defendants' interest in regulating Lemoine's speech is, on the facts here, limited. For that reason, Lemoine is likely to succeed on the merits of a First Amendment claim of retaliation.

Page 16 of 19

### 2. The Remedies Available at Law Are Inadequate

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting another source). Because Lemoine has clearly shown a likelihood of success on the merits of her claim that Defendants' application of the Code was retaliatory, irreparable injury exists.

### 3. The Balance of the Equities Weighs in Favor of Issuance and the Public Interest Would Not Be Disserved by Issuance

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, they weigh in Lemoine's favor. Obviously, Defendants must maintain order and safety. Equally, Defendants must ensure that *all* students' First Amendment rights are upheld. *See Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 536 (4th Cir. 2022). Reinstatement of Lemoine to the college accomplishes both.

Though Defendants do not address the balance of the equities regarding reinstatement, apparently, Lemoine can only complete the cosmetology program in person. (DE 5 at 7 n. 2.) Defendants only argue that granting Lemoine the relief she seeks "prohibits HGTC from protecting its other students . . . ." (DE 10 at 2.) But this is no explanation. Lemoine never threatened any HGTC student or teacher, and Defendants offer no other reason why unwinding Lemoine's suspension and no-trespass order is burdensome.

Nonetheless, the Court notes that nothing in this order should suggest that Defendants were wrong to discharge their heavy mantle of responsibility by fully

investigating concerns raised by students and personnel. It is entirely right that concerns and complaints are, as they were here, fully investigated and vetted. Nor should this order be taken to suggest that this Court has pre-judged the merits of the case. At this juncture, however, the Court concludes that Lemoine has made a clear showing that the First Amendment protects the speech in issue.

**B.    The Appropriate Injunctive Relief**

Rule 65(d)(1), Fed. R. Civ. P., provides that "[e]very order granting an injunction must:

(A)    state the reasons why it issued;

(B)    state its terms specifically; and

(C)    describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

"[T]he terms of Rule 65(d) 'are mandatory and must be observed in every instance.'" *Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 189 (4th Cir. 2023) (quoting another source).

**1.    The No-Trespass Order Against Lemoine Must Be Lifted**

Lemoine requests that this Court lift the final no-trespass order imposed against Lemoine on October 11, 2024. As noted above, Defendants entered a no-trespass order against Lemoine until Summer 2025. (*See* DE 5-5 at 1.) Defendants must lift the no-trespass order against Lemoine so that Lemoine may attend classes in person at HGTC.

### 2. Lemoine Must Be Re-Admitted into the Cosmetology Program

Lemoine requests that this Court re-admit her into the cosmetology program. As noted above, Lemoine was originally suspended from attending all classes at HGTC. (DE 5-2; DE 5-3.) Then, on October 11, 2024, Lemoine was "restricted to attending online classes" until Spring 2025. (DE 5-5 at 1.) Lemoine cannot complete her cosmetology coursework online. (*See* DE 1 at 7 n.2) Thus, Defendants must re-admit Lemoine as a student in the cosmetology program at HGTC.

### IV. CONCLUSION

For the reasons set forth above, Defendants' motion for leave to file sur-reply (DE 13) is **GRANTED**. (*See supra* text accompanying note 2.) And Plaintiff Leigha Lemoine's emergency motion for a temporary restraining order or, alternatively, a preliminary injunction (DE 5) is **GRANTED**, as follows:

(1) the no-trespass order against Lemoine must be lifted, and

(2) Lemoine must be re-admitted into the cosmetology program.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
December 16, 2024