IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| LEIGHA LEMOINE, | ) | CASE NO.: 4:24-cv-06032-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| HORRY GEORGETOWN | ) | **ORDER** |
| TECHNICAL COLLEGE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This case concerns whether a public technical college violated a student's constitutional rights when it disciplined her for off-campus social-media speech and later upheld that discipline through an internal appeal process. Plaintiff Leigha Lemoine ("Plaintiff" or "Lemoine") brings claims under 42 U.S.C. § 1983 against Horry Georgetown Technical College ("HGTC") and Defendants Marilyn Murphy Fore, Melissa Batten, and Kristin Sawyer, alleging First Amendment retaliation and infringement and procedural due process violations.

The parties have cross-moved for summary judgment. (DE 44; DE 45.) The motions have been fully briefed. (DE 48; DE 49; DE 53; DE 54.) For the reasons below, Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment is granted in part and denied in part. The Court also directs limited supplemental briefing to determine whether any declaratory or prospective equitable relief, including expungement, record correction, or related relief, remains live and available.

## I.    BACKGROUND

### A.    Factual Background

### 1.    The Parties and the Individual Defendants' Roles

In September 2024, Plaintiff Leigha Lemoine was enrolled in the cosmetology program at Defendant HGTC. Defendant Melissa Batten ("Batten") was HGTC's Vice President of Student Affairs. Defendant Kristin Sawyer ("Sawyer") was HGTC's Director of Student Development. Defendant Marilyn Murphy Fore ("Fore") was HGTC's President. The parties dispute the scope of each individual defendant's personal participation in the challenged disciplinary decisions. Defendants contend Batten investigated student concerns and implemented discipline when necessary, Sawyer assisted with student and staff interviews, and Fore received requests from Batten and served as a final decision-maker for certain actions, including suspension requests. Plaintiff contends Batten, Sawyer, and Fore each materially participated in the decision to remove her from HGTC and in the challenged appeal process. (DE 45 at 6; DE 44-1 at 33–35.)

### 2.    The Snapchat Message and Initial Student Concerns

On September 5, 2024, while off campus, Lemoine sent a message in a Snapchat group that included some HGTC students. The message concerned an off-campus interaction involving Lemoine's boyfriend's roommate, who was not an HGTC student or employee. Lemoine wrote: "But naw I was trying to be nice but f[**]k that some random ugly ass in bread looking f[**]k dude called me a bitch he needa get blasted." (DE 5-2; DE 15 at 1–2.)

The parties dispute the number and nature of student concerns reported to HGTC personnel after the Snapchat message. Defendants contend that three students reported concerns to instructor Chelise Smith, who then reported those concerns to her superiors. (DE 45 at 2.) Plaintiff contends that only one student, Emile Chapman, raised the Snapchat message itself, and that other concerns reported to Smith concerned separate matters not based on the "blasted" comment. (DE 44-1 at 5–6; DE 49 at 5–7.) For purposes of qualified immunity, this dispute is relevant to what each individual defendant knew, or reasonably could have understood, about whether the Snapchat message created a threat or substantial disruption.

### 3.    The September 11 Investigation and HGTC's Initial Assessment

On September 11, 2024, Batten and Sawyer met with Lemoine about the Snapchat message. Lemoine denied that "blasted" referred to physical harm and explained that she meant the roommate should be called out or held accountable for his behavior. (DE 5-1; DE 15 at 2.) Lemoine also stated that neither she nor her parents owned guns. Defendants contend that Lemoine's statements suggested a broader disassociation from firearms. Plaintiff disputes that characterization and contends she did not state that she had never fired a gun, had no experience with guns, or had no association with anyone who possessed firearms. (DE 44-1 at 8–9; DE 45 at 2–3.)

The record reflects that, at the conclusion of the September 11 meeting, HGTC accepted Lemoine's explanation of the Snapchat comment. The September 20 conduct

decision later recounted that Lemoine had been told there was then no evidence to find her in violation of the Student Code and that the College had accepted her explanation for the Snapchat comment. (DE 5-1; DE 15 at 2.) Plaintiff further contends that Sawyer communicated internally that there had been "no direct threat to others," and that Batten and Sawyer reached the same conclusion after speaking with students. (DE 44-1 at 6.) Defendants contend the matter remained under review and that HGTC was required to continue assessing safety and disruption concerns. (DE 45 at 2–4.)

### 4.     The Instagram Video and Interim Suspension

On September 13, 2024, HGTC discovered a video posted to Lemoine's Instagram account about a year earlier, in which Lemoine fired a handgun at a target while wearing western-style attire. (DE 5-1; DE 5-4; DE 15 at 2.) Plaintiff contends the video predated her enrollment at HGTC, was taken on private property, did not involve HGTC, and did not refer to any HGTC student, employee, or campus. (DE 44-1 at 7–8.) Defendants contend the video caused them to question Lemoine's prior explanation of the Snapchat message and her statements concerning firearms. (DE 45 at 3–4.)

Batten requested authorization from Fore for an interim suspension. Fore authorized the interim suspension. (DE 45 at 3; DE 45-4.) Plaintiff contends that, before authorizing the interim suspension, Fore was presented with both the Snapchat message and the Instagram video. (DE 44-1 at 33–34.) Defendants contend

Fore acted reasonably based on the safety concerns presented to her. (DE 45 at 30–32.)

On September 17, 2024, Lemoine again met with HGTC personnel, including Batten and Sawyer, to discuss the Instagram video. Lemoine acknowledged that she was the person in the video, stated that the video was from around Thanksgiving 2023, stated that the gun did not belong to her, and stated that it was the only time she had fired a gun. She also offered consent for HGTC to search her belongings, which HGTC declined. (DE 5-1; DE 15 at 2; DE 44-1 at 8.) At that meeting, Lemoine received an interim suspension and no-trespass notice. (DE 5-3; DE 15 at 2.)

### 5.    The September 20 Conduct Decision

On September 20, 2024, HGTC issued a conduct decision suspending Lemoine from HGTC and imposing a no-trespass order. The decision identified two matters as the basis for discipline: the Snapchat message using the term "blasted" and the Instagram video of Lemoine firing a handgun. (DE 5-1; DE 45-5.) The decision stated that the Instagram video caused HGTC to question Lemoine's explanation of the term "blasted," and that, "[i]n today's climate," Lemoine's "failure to disclose the existence of the video" together with her use of "blasted" caused concern about her ability to remain in the cosmetology cohort. The letter further stated that the two facts caused "a significant amount of apprehension related to the presence and use of guns" and had impacted the learning environment because students and employees expressed that they felt unsafe. (DE 5-1; DE 45-5.)

The September 20 decision concluded that Lemoine violated the Student Code provision prohibiting conduct that disrupts the educational process, interferes with the rights of others, or adversely interferes with normal college functions and services. (DE 5-1; DE 45-5.) Sawyer issued the September 20 letter. (DE 15 at 3.) Plaintiff contends Batten and Sawyer drafted the letter together and that Fore approved or ratified the disciplinary action. (DE 44-1 at 33–34.) Defendants dispute that each individual defendant personally violated federal law and contend their conduct was a reasonable response to perceived safety concerns. (DE 45 at 33–34; DE 53 at 4–7.)

### 6.    The Appeal Process

Lemoine timely appealed the September 20 conduct decision. (DE 45-7.) On October 1, 2024, HGTC sent Lemoine notice of the appeal hearing, committee membership, agenda, and evidence to be presented. (DE 45-6.) The notice listed Batten as the person filing the complaint and as an ex officio, non-voting member of the appeal committee. (DE 45-6.)

Before the appeal hearing, Assistant Vice President and Dean Theresa Strong emailed Batten, Sawyer, and Fore regarding the hearing format. Strong wrote that she had spoken with Audrey Heisler and that "none of us are comfortable with how the hearing is set up in fear of the student retaliating once she hears what the instructors have to say." Strong further stated that, because the complaint related to potential violence and involved comments or discussion related to a gun, certain instructors were not comfortable providing statements directly to Lemoine or in her

6

presence. (DE 44-20; DE 44-1 at 10–11.) Plaintiff contends this communication shows that Defendants created an ad hoc hearing process designed to withhold witnesses and evidence from her. Defendants contend the hearing process provided notice, an opportunity to be heard, and the evidence HGTC intended to present. (DE 44-1 at 10–12; DE 45 at 4–5, 24–28.)

The HGTC Student Code provided that a student in an appeal hearing had, among other rights, the right to present witnesses, know the names of witnesses who may be called to testify, review available evidence that may be presented, know the identity of the person bringing the charges, and hear witnesses on behalf of the person bringing the charges. (DE 44-17 at 3–17.) Plaintiff contends she was not provided the identities of the persons allegedly making the charges or the evidence supporting the claimed disruption or safety concerns. Defendants contend HGTC did not call witnesses at the hearing and therefore did not withhold witness testimony it intended to present. (DE 44-1 at 10–12; DE 45 at 4–5.)

The appeal hearing occurred on October 10, 2024. The Hearing Committee affirmed the finding that the Snapchat message, considered together with the Instagram video, violated the Student Code, but modified the sanction to restrict Lemoine to online classes through the Spring 2025 semester and to maintain the no-trespass order until Summer 2025. (DE 5-5; DE 15 at 3–4.) During the hearing, Batten stated that neither the Snapchat message alone nor the Instagram video alone violated the Code. (DE 5 at 7; DE 15 at 3–4.) The appeal decision advised Lemoine of

another appeal to the College President. Lemoine did not file that further appeal. (DE 45 at 32–33; DE 45-9.)

### 7.     Subsequent Events Relevant to Remedies and Procedural Posture

Lemoine filed this action on October 23, 2024, asserting claims under 42 U.S.C. § 1983 for First Amendment retaliation and infringement and procedural due process violations against HGTC and the individual defendants in their official and individual capacities. (DE 1.) On December 17, 2024, the Court granted preliminary injunctive relief, ordered HGTC to lift the no-trespass order, and ordered that Lemoine be readmitted to the cosmetology program. (DE 15.)

After Lemoine returned to HGTC, HGTC initiated additional disciplinary proceedings in Spring 2025. Defendants moved to dissolve the preliminary injunction based on those later events. (DE 25.) On August 1, 2025, the Court denied the motion without prejudice. (DE 32.) Defendants state that Lemoine has since completed her cosmetology hours, sat for the state licensure examination, and received her cosmetology license. (DE 45 at 6.) These later events are relevant to the scope of available relief and mootness but do not alter the facts known to the individual defendants at the time of the Fall 2024 disciplinary decisions.

### B.     Procedural Background

Lemoine filed this action on October 23, 2024. (DE 1.) The Complaint asserts four causes of action under 42 U.S.C. § 1983: (1) First Amendment retaliation and infringement against all Defendants; (2) procedural due process violations against all Defendants; (3) individual-capacity First Amendment retaliation and infringement

against Fore, Batten, Sawyer, and the Doe defendants; and (4) individual-capacity procedural due process violations against Fore, Batten, Sawyer, and the Doe defendants. (*Id.* ¶¶ 65–126.) Lemoine seeks declaratory and injunctive relief, nominal damages, compensatory damages, punitive damages against the individual defendants, and attorneys' fees and costs. (*Id.* at 28–29.)

On October 25, 2024, Lemoine moved for a temporary restraining order or, in the alternative, a preliminary injunction, seeking to enjoin enforcement of the suspension and no-trespass order and to require HGTC to readmit her to the cosmetology program. (DE 5.) On December 17, 2024, the Court granted preliminary injunctive relief, ordered the no-trespass order lifted, and ordered that Lemoine be readmitted to the cosmetology program. (DE 15.) The Court concluded, for purposes of preliminary relief, that Lemoine had made a clear showing of likelihood of success on her First Amendment retaliation claim. (*Id.*)

After Lemoine returned to HGTC, Defendants initiated additional disciplinary proceedings during the Spring 2025 semester. On May 28, 2025, Defendants moved to dissolve the preliminary injunction based on those later events. (DE 25.) Lemoine opposed the motion and moved for leave to file a sur-reply. (DE 26; DE 28; DE 29.) On August 1, 2025, the Court granted leave to file the sur-reply and denied Defendants' motion to dissolve the preliminary injunction without prejudice. (DE 32.) The parties now cross-move for summary judgment. Lemoine moved for summary judgment on December 19, 2025. (DE 44.) Defendants responded, and Lemoine replied. (DE 48; DE 54.) Defendants moved for summary judgment the same day. (DE

45.) Lemoine responded, and Defendants replied. (DE 49; DE 53.) The motions are fully briefed and ripe for review.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of identifying the basis for the motion and the portions of the record demonstrating the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party will bear the burden of proof at trial, the movant may satisfy that responsibility by pointing to an absence of evidence supporting an essential element of the nonmovant's case. *Id*. at 324–25.

Once the movant makes that showing, the nonmoving party must identify specific record evidence from which a reasonable jury could find in its favor. *See* Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986). A fact is material if it could affect the outcome under governing law, and a dispute is genuine if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). Conclusory allegations or denials do not suffice. *Id*.

Summary judgment may not be granted merely because the court believes the movant ultimately is more likely to prevail at trial. *See Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). "The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to

10

return a favorable verdict." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). "Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted). A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 659–60.

## III.    DISCUSSION

### A.    Preliminary Issues

#### 1.    Scope of Claims and Parties

To begin with, the Court identifies the claims, parties, and capacities at issue on summary judgment. Lemoine brings this action under 42 U.S.C. § 1983, alleging that Defendants violated her rights under the First and Fourteenth Amendments when HGTC suspended her, imposed a no-trespass order, and upheld discipline through the College's internal appeal process. (DE 1 ¶¶ 65–126.) The Complaint asserts First Amendment retaliation and infringement claims and procedural due process claims against HGTC, Fore, Batten, and Sawyer. (*Id.*) The claims against Fore, Batten, and Sawyer are asserted against them in both their official and individual capacities. (*Id.*)

The Court construes the summary-judgment briefing as presenting four principal issues: (1) whether Defendants violated Lemoine's First Amendment rights

by disciplining her for the Snapchat message and Instagram video; (2) whether Defendants violated Lemoine's procedural due process rights in connection with the suspension and appeal process; (3) whether the individual defendants are entitled to qualified immunity on the individual-capacity damages claims; and (4) whether Eleventh Amendment immunity, mootness, or other remedial limitations bar some or all of the relief Lemoine seeks. (DE 44; DE 45; DE 48; DE 49; DE 53; DE 54.)

Although the Complaint also names Jane Doe and John Doe defendants, the parties' summary-judgment briefing focuses on HGTC, Fore, Batten, and Sawyer. The record does not identify the Doe defendants, and no party seeks summary judgment based on conduct by any Doe defendant separate from the conduct attributed to the named defendants. Accordingly, the Court's analysis addresses only HGTC, Fore, Batten, and Sawyer.

The Court also notes that Lemoine's Complaint references the South Carolina Constitution and alleges that portions of the Student Code are vague or overbroad. (DE 1 ¶¶ 83–126.) However, the parties' summary-judgment briefing principally addresses Lemoine's federal First Amendment and procedural due process claims under § 1983, the individual defendants' qualified-immunity defense, and Defendants' Eleventh Amendment and mootness defenses. To the extent any state constitutional, vagueness, or overbreadth theories are not independently developed in the summary-judgment briefing, the Court does not address them as separate grounds for summary judgment except insofar as they overlap with the First Amendment and procedural due process claims analyzed below.

With that scope clarified, the Court first addresses threshold issues concerning capacity, immunity, and available remedies, then turns to the First Amendment and procedural due process claims. Because qualified immunity applies only to individual-capacity damages claims, the Court addresses qualified immunity separately as to each individual defendant and each constitutional claim.

## 2. Capacity, Immunity, and Remedies Framework

Before turning to the constitutional merits, the Court clarifies the capacities in which Defendants are sued and the remedies potentially available. Lemoine brings claims under 42 U.S.C. § 1983 against HGTC and against Fore, Batten, and Sawyer in both their official and individual capacities. (DE 1 ¶¶ 65–126.) These distinctions matter because different immunity doctrines and remedial limitations apply depending on the defendant, the capacity in which the defendant is sued, and the relief requested.

Defendants pleaded Eleventh Amendment immunity as an affirmative defense. (DE 11 ¶ 71.) At summary judgment, they *briefly* renew the issue under a "Damages" heading, arguing that, to the extent Lemoine seeks money damages against HGTC, such claims are barred and that Eleventh Amendment immunity extends to arms of the State, state agencies, and state officers acting in their official capacities. (DE 45 at 8.) Although Defendants do not develop the issue at length, the defense was preserved and is properly considered to the extent it affects the remedies available in this action.

The Eleventh Amendment generally bars suits in federal court against "an unconsenting State[,]" and that immunity extends to state agencies and other governmental entities properly characterized as arms of the State. *Gray v. Laws*, 51 F.3d 426, 430–34 (4th Cir. 1995). A suit against a state official in her "official capacity" for money damages is treated as a suit against the State itself. *Id*. at 430. In determining whether a governmental entity is an arm of the State, courts consider whether a judgment would be paid by the State, the entity's degree of autonomy, whether the entity addresses state or local concerns, and how state law treats the entity. *Id*. at 440 n.2.

Authority from this District has addressed HGTC's status directly. In *Williams v. Horry-Georgetown Technical College*, the court held that HGTC is part of the State Board for Technical and Comprehensive Education, which South Carolina law designates as "a continuing body and agency and instrumentality of the State," and concluded that HGTC satisfies the *Ram Ditta* arm-of-the-State factors. 26 F. Supp. 3d 519, 534–35 (D.S.C. 2014); *see Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm'n*, 822 F.2d 456 (4th Cir.1987). Applying that framework, and in light of *Williams*, the Court concludes that HGTC is an arm of the State for purposes of Eleventh Amendment immunity.

Accordingly, Lemoine may not recover money damages from HGTC under § 1983. Nor may she recover money damages from Fore, Batten, or Sawyer in their official capacities because official-capacity damages claims against state officials are

14

treated as claims against the State. This ruling does not affect Lemoine's individual-capacity damages claims against Fore, Batten, or Sawyer.

This ruling also does not, by itself, resolve whether any prospective official-capacity relief remains available. The Eleventh Amendment does not necessarily bar prospective relief against an appropriate state official to remedy an ongoing violation of federal law. Any request for prospective relief, however, must still satisfy Article III requirements, including standing, redressability, and mootness. The Court therefore addresses separately whether Lemoine's requests for declaratory or injunctive relief remain live in light of subsequent events.

Qualified immunity is a separate doctrine. It protects government officials from individual-capacity damages liability unless the official violated a constitutional right that was clearly established at the time of the challenged conduct. Qualified immunity does not apply to HGTC, does not apply to official-capacity claims, and does not bar prospective injunctive relief. Accordingly, the Court addresses qualified immunity only as to the individual-capacity damages claims against Fore, Batten, and Sawyer.

Lemoine seeks declaratory and injunctive relief, nominal damages, compensatory damages, punitive damages against the individual defendants, attorneys' fees, and costs. (DE 1 at 27–28.) These remedies require separate consideration. Damages claims may preserve a live controversy even if prospective educational relief is no longer necessary. Punitive damages, if otherwise available,

may be recovered only against individual-capacity defendants upon the required showing. Attorneys' fees and costs, if appropriate, may be addressed after judgment.

With these principles in mind, the Court grants Defendants' motion to the extent it seeks dismissal of money-damages claims against HGTC and official-capacity money-damages claims against Fore, Batten, and Sawyer. The Court separately considers below whether Lemoine's requests for prospective declaratory or injunctive relief are moot and addresses qualified immunity in connection with the individual-capacity claims.

### 3. Mootness

Defendants also contend that Lemoine's requests for declaratory and permanent injunctive relief are moot because she is no longer enrolled at HGTC, has completed her cosmetology hours, has sat for the licensure examination, and has obtained her cosmetology license. (DE 45 at 6–8.) The Court construes this argument as directed to prospective relief, not to the action as a whole.

Mootness is a jurisdictional doctrine derived from Article III's case-or-controversy requirement. A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *See Eden, LLC v. Justice*, 36 F.4th 166, 169–71 (4th Cir. 2022). The Court may decide only disputes that continue to matter in the real world, and a claim for relief is moot when the Court's ruling could have no practical effect on the outcome. *See Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010). The party asserting

16

mootness bears the burden of showing that no live controversy remains. *See Eden, LLC*, 36 F.4th at 171.

Defendants have not shown that this case is moot in its entirety. As explained above, Lemoine may not recover money damages from HGTC or from the individual defendants in their official capacities. But she continues to seek nominal damages, compensatory damages, and punitive damages against Fore, Batten, and Sawyer in their individual capacities. (DE 1 at 27–28.) Those damages claims arise from alleged completed constitutional violations and are not mooted merely because Lemoine later completed the cosmetology program and obtained licensure.

The mootness question is narrower as to prospective relief. The Court previously entered preliminary injunctive relief requiring HGTC to lift the no-trespass order and readmit Lemoine to the cosmetology program. (DE 15.) Because Lemoine has now completed her cosmetology hours and obtained her license, any request for relief requiring HGTC to readmit her to the cosmetology program or allow her to complete in-person coursework is moot. Likewise, to the extent the no-trespass order has been lifted, expired, or otherwise no longer restricts Lemoine's access, a request to enjoin that specific order is moot.

The present record does not fully resolve whether any other prospective or equitable relief remains available. If the challenged discipline, appeal decision, or related disciplinary proceedings remain in Lemoine's educational record or otherwise produce concrete collateral consequences, then relief directed at those continuing effects may remain live. *See United States v. Hardy*, 545 F.3d 280, 283–85 (4th Cir.

17

2008). But that issue has not been substantially developed in the summary-judgment briefing.

Accordingly, the Court concludes that Lemoine's requests for readmission and relief from the no-trespass order are moot to the extent those remedies have already been afforded or are no longer necessary. The Court does not decide at this stage whether any declaratory, expungement, record-correction, or other prospective equitable relief remains available. If any constitutional claim remains after the Court's merits analysis, the Court will direct supplemental briefing limited to whether any such prospective or equitable relief remains live and available.

## B.     First Amendment Retaliation and Infringement

### 1.     Governing Law

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits public officials from retaliating against an individual for engaging in protected speech. *See ACLU v. Wicomico County, Md.,* 999 F.2d 780, 785 (4th Cir.1993). The First Amendment protects "not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right[.]" *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To establish a First Amendment retaliation claim under § 1983, a plaintiff must show "that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct."

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *see also Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017).

Because this case arises in the public-education context, the Court must also consider the standards governing student speech. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Nor are public colleges and universities "enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). Indeed, the Supreme Court has cautioned that, "because of the acknowledged need for order," First Amendment protections do not "apply with less force on college campuses than in the community at large." *Id.* The "college classroom with its surrounding environs is peculiarly the marketplace of ideas." *Id.* at 180–81 (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). Thus, a public college may not discipline a student merely because it disagrees with the student's expression, finds the expression offensive, or invokes conventions of civility or decency. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670–71 (1973) ("[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency.").

At the same time, student speech rights must be weighed against the educational setting. Under *Tinker*, a school may regulate student speech when school officials can show facts that reasonably support a forecast of substantial disruption of school operations or material interference with the rights of others. 393 U.S. at

19

509, 513–14. But *Tinker* requires more than "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id*. at 509. "Undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id*. at 508.

The Supreme Court has recognized additional categories of student speech that schools may regulate in certain K-12 circumstances, including lewd or vulgar school speech, school-sponsored speech, and speech reasonably viewed as promoting illegal drug use. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685–86 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271–73 (1988); *Morse v. Frederick*, 551 U.S. 393, 403, 408–10 (2007). Those cases do not, however, give public educational institutions general authority to punish student expression simply because the speech is crude, immature, offensive, or alarming. Their force is also diminished in the public-college setting, where students are adults and where the university environment receives especially robust First Amendment protection. *See Healy*, 408 U.S. at 180–81. The scope of a school's regulatory authority therefore depends on the nature of the speech, the setting in which it occurred, the school's connection to the speech, and the evidence of disruption, threatened harm, or interference with the rights of others.

Those limits are especially important when the speech occurs off campus. In *Mahanoy Area School District v. B.L.*, the Supreme Court held that K-12 public schools may have some authority to regulate off-campus student speech, but that off-campus speech generally receives greater First Amendment protection because the

20

school "will rarely stand in loco parentis," the school's regulatory interests are diminished, and courts "must be more skeptical" of efforts to regulate speech that may otherwise cover "all the speech a student utters during the full 24-hour day." 594 U.S. 180, 188–90 (2021). The Court identified circumstances in which off-campus speech may still implicate school interests, including serious bullying or harassment, threats aimed at teachers or students, failure to follow rules concerning lessons or school activities, and breaches of school-security devices. *Id*. at 188. But *Mahanoy* reinforces that schools must identify a sufficient school-related interest before disciplining off-campus speech. The Court also emphasized that off-campus speech may diminish the school's interest in punishment where the speech occurs outside school hours, away from school, through a personal device or account, and does not identify the school or target members of the school community. *Id*. at 190–91.

A separate limitation applies if speech constitutes a true threat. The First Amendment does not protect true threats. *Virginia v. Black*, 538 U.S. 343, 359 (2003). A true threat is a serious expression of an intent to commit unlawful violence against a particular individual or group of individuals. *Id*. "True" threats are distinguished from "jests, hyperbole, or other statements that when taken in context do not convey a real possibility that violence will follow[.]" *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)) (internal quotation omitted). Although the existence of a threat depends on what the statement conveys to the person on the receiving end, *Counterman* confirms that First Amendment protection also requires attention to the speaker's mental state. *Id*. at 74–75. At

21

minimum, a speaker must have some subjective understanding of the threatening nature of the statement, and recklessness is sufficient. *Id*. at 69, 79–82. Thus, in determining whether speech is a true threat, the Court must consider both context and whether the record supports the required culpable mental state.

Applying these principles here, the Court must determine whether Lemoine's Snapchat message and Instagram video were protected speech, whether either item constituted a true threat, and whether HGTC had sufficient evidence of actual or reasonably forecast substantial disruption to justify discipline. If the speech was protected, the Court must then determine whether Defendants took adverse action against Lemoine and whether the discipline was causally connected to the protected speech. The Court addresses those issues in turn.

### 2.     Protected Speech

The first question is whether Lemoine's Snapchat message and Instagram video were protected by the First Amendment. Defendants do not dispute that the discipline was based, at least in substantial part, on the Snapchat message and Instagram video. The September 20 conduct decision letter expressly identified both items as the basis for HGTC's conclusion that Lemoine violated the Student Code. (DE 5-1; DE 45-5 at 3.) Defendants contend, however, that the speech lost constitutional protection because the Snapchat message, when considered together with the Instagram video, created a reasonable safety concern and caused students and employees to feel unsafe. Lemoine contends the speech was off-campus, private,

22

unrelated to school activity, not directed at any HGTC student or employee, not a true threat, and unsupported by evidence of substantial disruption.

### a.    Snapchat Message

The Snapchat message was sent while Lemoine was off campus. The message appeared in a private Snapchat group that included some HGTC students, but it did not arise from school-sponsored activity, did not involve coursework, did not address HGTC personnel, and did not refer to any HGTC campus or event. The message concerned an off-campus interaction involving Lemoine's boyfriend's roommate, who was neither an HGTC student nor an employee. Lemoine wrote that the roommate "needa get blasted." (DE 5-2 at 1; DE 15 at 1–2.)

The phrase was crude, angry, and capable of causing concern if read literally or in isolation. But the First Amendment does not permit a public college to treat every intemperate or ambiguous phrase as unprotected speech. Context matters. The message was not directed to the roommate or to HGTC, and did not identify any HGTC student, employee, classroom, or campus as a target. When Batten and Sawyer interviewed Lemoine on September 11, Lemoine denied that "blasted" referred to physical harm and explained that she meant the roommate should be called out or held accountable for his behavior. (DE 5-1; DE 15 at 2.) The September 20 conduct decision letter acknowledged that HGTC had accepted Lemoine's explanation and had told her there was then no evidence to find her in violation of the Student Code. (DE 5-1; DE 45–5.)

23

On this record, the Snapchat message was protected speech unless it constituted a true threat or unless HGTC could discipline it under the student-speech substantial-disruption standard. The Court addresses those questions below.

### b.    Instagram Video

The Instagram video likewise involved expression outside the school setting. The video was posted about a year before HGTC discovered it. It showed Lemoine firing a handgun at a target while wearing western-style attire. The record does not show that the video was recorded on HGTC property, involved HGTC activity, referred to HGTC, or was directed toward any HGTC student or employee. (DE 5-1; DE 5-4; DE 15 at 2.)

Defendants argue that the Instagram video changed the context of the Snapchat message because Lemoine had previously stated that she and her parents did not own guns. Defendants therefore contend that the video caused them to question Lemoine's explanation of the Snapchat message and her broader relationship to firearms. That argument explains why HGTC continued its investigation. It does not, standing *alone*, establish that the Instagram video itself was unprotected speech. Lawful target shooting, without more, is not a threat. Nor does the mere existence of a prior video depicting lawful firearm use transform a separate ambiguous Snapchat message into a serious expression of intent to commit unlawful violence.

The Instagram video may be considered as part of the surrounding context for HGTC's response, including the reasonableness of its investigation and any

24

temporary safety measures. But the video itself was off-campus expression, not directed at HGTC or any member of the HGTC community, and not inherently outside the protection of the First Amendment.

### c. True Threat

Defendants also contend that Lemoine's words and actions constituted a true threat. A true threat is not protected by the First Amendment. *See Virginia v. Black*, 538 U.S. at 359. But the true-threat exception is limited to serious expressions of intent to commit unlawful violence against a particular individual or group of individuals. *Id*. at 359–60. The inquiry must consider the words used, the surrounding context, the audience, the target, and, after *Counterman*, the speaker's culpable mental state. *Counterman*, 600 U.S. at 74–75. *Counterman* requires that the speaker has at a minimum recklessness, that is, a conscious disregard of a substantial risk that her communications would be viewed as threatening violence. *Id*. at 81–82.

Viewing the record in the light most favorable to Defendants, the Snapchat message used language that could cause concern. The term "blasted" can carry violent connotations, and HGTC officials were entitled to investigate when students or faculty reported that the language made them uncomfortable or unsafe. Schools are not required to ignore potential safety concerns, particularly when a reported statement appears to reference violence.

*But* investigation is different from discipline. The record does not show that Lemoine communicated a serious expression of intent to commit unlawful violence against an HGTC student, employee, or campus. The Snapchat message referred to

25

a nonstudent involved in an off-campus personal dispute. It did not threaten HGTC, did not identify a school target, and was not sent to the person referenced in the message. When questioned, Lemoine denied any violent meaning and explained that she meant the person should be called out or held accountable. HGTC's own September 20 decision acknowledged that this explanation had initially been accepted. (DE 5-1; DE 45-5.)

The Instagram video does not change that conclusion. The video showed Lemoine firing a handgun at a target about a year earlier. It did not contain threatening language, reference the Snapchat message, or identify any HGTC-related target. The combination of an ambiguous slang phrase and an old target-shooting video may have justified additional inquiry, but it did not transform Lemoine's speech into a true threat on this record.

Nor does the record establish the mental-state component required by *Counterman.* The evidence does not show that Lemoine consciously disregarded a substantial risk that her Snapchat message would be understood as a serious threat of unlawful violence toward HGTC students or employees. Her explanation, the off-campus context, the nonstudent subject of the message, and HGTC's initial acceptance of her explanation all weigh against treating the statement as a true threat. Accordingly, Defendants have not shown that the true-threat doctrine removed Lemoine's speech from First Amendment protection.

### d.     Substantial   Disruption   or   Reasonable   Forecast   of Disruption

The remaining question is whether HGTC could discipline Lemoine's off-campus speech because it materially and substantially disrupted school operations or because HGTC reasonably forecast such disruption. The Court recognizes that HGTC had a legitimate interest in student safety and in maintaining an educational environment in which students and employees could attend class without reasonable fear of violence. That interest permitted HGTC to investigate the Snapchat message, speak with students and faculty, interview Lemoine, review the Instagram video, and take reasonable steps to assess whether a genuine threat or disruption existed.

But *Tinker* requires more than discomfort, apprehension, or generalized safety concerns. 393 U.S. at 509–10. A public school may not restrict protected speech based on undifferentiated fear or a desire to avoid unpleasantness. And under *Mahanoy*, HGTC's regulatory interest was diminished because the speech occurred off campus, outside school supervision, in a private social-media setting, and concerned a nonstudent and non-school matter.

The summary-judgment record does not show actual substantial disruption. The record reflects that some students or employees expressed discomfort or safety concerns after learning of the Snapchat message and Instagram video. (DE 45-1; DE 45-2; DE 45-3; DE 45-7; DE 45-8.) But the record does not show that classes stopped, instruction materially changed, campus operations were substantially interrupted, or Lemoine engaged in conduct at school that interfered with the rights of others. Nor does the record show that Lemoine brought a weapon to campus, threatened to do so,

27

directed threatening words to anyone at HGTC, or refused to cooperate with HGTC's inquiry. To the contrary, she attended meetings, explained the Snapchat message, answered questions about the Instagram video, and offered to allow HGTC to search her belongings. (DE 5-1; DE 15 at 2; DE 44-1 at 8.)

Nor did HGTC identify facts sufficient to support a reasonable forecast of substantial disruption. A reasonable forecast must be grounded in evidence, not speculation. *See Tinker*, 393 U.S. at 513–14. The September 20 decision stated that, "[i]n today's climate," the Snapchat message and Instagram video caused apprehension related to guns and caused students and employees to feel unsafe. (DE 5-1; DE 45–5 at 3.) The Court does not minimize those concerns. But the constitutional question is not whether HGTC officials were permitted to be concerned or to investigate. The question is whether the record contains sufficient facts showing that Lemoine's off-campus speech either caused or reasonably threatened a material and substantial disruption of HGTC's educational environment. On this record, it does not.

The facts here are materially different from cases involving threats directed at students or school personnel, severe harassment, targeted bullying, school-sponsored speech, or speech that foreseeably invades the school environment in a substantial way. Lemoine's Snapchat message concerned a nonstudent and off-campus personal matter. The Instagram video was old, involved target shooting, and did not reference HGTC. The record does not support a finding that either item, separately or together, gave HGTC a constitutionally sufficient basis to impose a suspension and no-trespass

28

order. Moreover, the concerns later relied on by Defendants, chiefly those made to Lemoine's instructor, Chelise Smith, were not referenced in the conduct decision letter, did not concern the Instagram video, and were inconsistent with one another. (DE 45-1.)

Accordingly, the Court concludes that Lemoine's Snapchat message and Instagram video were protected speech. Defendants were entitled to investigate the reported concerns and to take reasonable steps to determine whether a threat or substantial disruption existed. But the First Amendment did not permit HGTC to discipline Lemoine for protected off-campus expression absent a *true* threat, actual substantial disruption, or a reasonable forecast of substantial disruption supported by the record.

### 3.    Adverse Action

The second element of Lemoine's First Amendment retaliation claim requires action that adversely affected her First Amendment rights. *See Constantine*, 411 F.3d at 499. Retaliation is actionable because "retaliatory actions may tend to chill individuals' exercise of constitutional rights," but the plaintiff need not show that the challenged action actually caused her to stop speaking. *Id.* at 500 (quoting *ACLU of Md., Inc.*, 999 F.2d at 785). The inquiry is objective: a plaintiff suffers an adverse action if the defendant's allegedly retaliatory conduct would likely deter "a person of ordinary firmness" from exercising First Amendment rights. *Id.* The plaintiff's actual response to the challenged conduct may provide some evidence of chilling effect, but it is not dispositive. *Id.*

29

That element is satisfied here. HGTC imposed an interim suspension, issued a no-trespass notice, suspended Lemoine from in-person participation in the cosmetology program, and later upheld discipline through the internal appeal process. (DE 5-1; DE 5-3; DE 5-5; DE 45-5; DE 45-9.) These actions were not minor criticisms, warnings, or administrative inconveniences. They removed Lemoine from campus, restricted her access to in-person instruction, interrupted her participation in a career-licensure program, and subjected her to formal discipline under the Student Code.

A reasonable student in Lemoine's position would likely be deterred from engaging in similar speech if the result could be suspension, exclusion from campus, delayed access to required coursework, or disciplinary findings in her educational record. Accordingly, the interim suspension, no-trespass order, September 20 suspension, and appeal decision qualify as adverse actions for purposes of the First Amendment claim.

### 4.    Causation

The third element requires a causal relationship between the protected speech and the adverse action. *See Constantine*, 411 F.3d at 499; *Buxton*, 862 F.3d at 427. To establish causation, Lemoine must show that her protected speech was a "substantial factor" or "motivating factor" in the challenged disciplinary decision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If she makes that showing, Defendants may avoid liability by proving, by a preponderance of the evidence, that they would have reached the same decision even in the absence of the protected

speech. *Id.*; *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318–19 (4th Cir. 2006) (describing the causation requirement as requiring a sufficient nexus between protected speech and the adverse action).

The causation element is also satisfied on this record. The September 20 conduct decision letter expressly identified the Snapchat message and Instagram video as the basis for the disciplinary finding. The letter stated that the Instagram video caused HGTC to question Lemoine's explanation of the Snapchat message, that the combination of the "blasted" comment and the video caused apprehension about guns, and that those facts led HGTC to conclude that Lemoine violated the Student Code. (DE 5-1; DE 45-5.) The appeal decision likewise affirmed the violation based on the Snapchat message considered together with the Instagram video. (DE 5-5; DE 45-9.)

Defendants argue that the discipline was based not on protected expression, but on safety concerns, disruption, and Lemoine's alleged lack of candor regarding firearms. That argument does not defeat causation. The asserted safety and disruption concerns arose from the content and perceived meaning of the Snapchat message and Instagram video. Likewise, the alleged lack-of-candor rationale was tied to HGTC's view that the Instagram video undermined Lemoine's explanation of the Snapchat message and her statements about firearms. Thus, even under Defendants' characterization, the challenged discipline was substantially motivated by the protected speech and the meaning HGTC attributed to that speech.

31

Nor have Defendants identified an independent, non-speech basis on which HGTC would have imposed the same suspension and no-trespass order absent the Snapchat message and Instagram video. The disciplinary record does not show that Lemoine was suspended for unrelated misconduct, possession of a weapon on campus, refusal to cooperate, violation of a neutral campus safety directive, or conduct separate from the speech at issue. To the contrary, the formal disciplinary decision rested on the Snapchat message and Instagram video. (DE 5-1; DE 45-5.)

Accordingly, no reasonable jury could conclude on this record that Lemoine's protected speech was not a substantial or motivating factor in the challenged discipline. The causation element is met.

### 5.    First Amendment Merits Disposition

For the above reasons, Lemoine has established the merits of her First Amendment claim. The Snapchat message and Instagram video were protected speech. Neither item, separately or together, constituted a true threat. Nor did Defendants establish actual substantial disruption or a reasonable forecast of substantial disruption sufficient to justify discipline for off-campus speech. The suspension, no-trespass order, and appeal decision were adverse actions, and those actions were causally connected to the protected speech.

The Court therefore grants Lemoine's motion for summary judgment on the First Amendment merits to the extent set forth in this Order. The Court concludes that the challenged discipline violated the First Amendment. Defendants' motion for summary judgment is denied as to the First Amendment merits.

This ruling is subject to the remedial limitations discussed above and below. Lemoine may not recover money damages from HGTC or from Fore, Batten, or Sawyer in their official capacities. The Court separately addresses whether any declaratory or prospective equitable relief remains available against an appropriate official-capacity defendant. The Court also addresses separately whether Fore, Batten, and Sawyer are entitled to qualified immunity from individual-capacity damages liability.

### 6.    Individual-Capacity First Amendment Claims and Qualified Immunity

The Court next addresses whether Fore, Batten, and Sawyer are entitled to qualified immunity on Lemoine's individual-capacity First Amendment claims. Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It protects officials from liability for reasonable mistakes of law, fact, or mixed questions of law and fact. *Id*. Officials therefore are not liable for "bad guesses in gray areas"; they are liable for "transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

The qualified-immunity inquiry asks two questions: whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right, and whether that right was clearly established at the time of the challenged conduct. *See Pearson*, 555 U.S. at 232; *see also Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024). Courts may address those questions in either order. *See Pearson*, 555 U.S. at 236. Qualified immunity protects officials unless existing law placed the constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741. It gives officials "breathing room to make reasonable but mistaken judgments about open legal questions" and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743; *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

Qualified immunity must be analyzed defendant by defendant. Section 1983 does not permit individual-capacity liability based on respondeat superior or a defendant's general supervisory status. Rather, "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The question is therefore not only whether HGTC's discipline violated the First Amendment, but whether each individual defendant personally participated in conduct that violated Lemoine's clearly established First Amendment rights.

### a.    Clearly Established Right

A right is clearly established when, at the time of the official's conduct, the law was sufficiently clear that every reasonable official would understand that the

34

challenged conduct was unlawful. *See Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020). The inquiry begins by defining the right at issue. *See Hicks v. Ferreyra*, 64 F.4th 156, 170 (4th Cir. 2023). In determining whether the right was clearly established, courts look to decisions of the Supreme Court, the Fourth Circuit, and the highest court of the State. *See Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 221 (4th Cir. 2018).

The clearly established inquiry must not define the right "at a high level of generality." *Mullenix*, 577 U.S. at 12. Rather, the Court must ask whether, at the time of the challenged conduct, existing precedent placed the constitutional question beyond debate for a reasonable official in the defendant's position. *See al-Kidd*, 563 U.S. at 741–42. A case directly on point is not required, but the unlawfulness of the official's conduct must be "apparent" in light of preexisting law. *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). The relevant inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *See Mullenix*, 577 U.S. at 12. Stated another way, it is unnecessary for the exact conduct at issue to have been held unlawful; instead, the existing authority must be such that the unlawfulness of the conduct is manifest. *See Merchant v. Bauer*, 677 F.3d 656, 665–66 (4th Cir. 2012).

Here, the right must be framed in light of the facts known to the officials at the time. Lemoine effectively defines the right as a public college student's right not to be suspended and excluded from campus for off-campus, non-school-sponsored social-media expression where the speech occurred outside school hours, did not involve a

35

school activity, did not occur in the presence of school personnel, did not constitute a true threat, and did not substantially disrupt the school environment or pose a serious risk of disruption. (DE 49 at 27–28; DE 44-1 at 35–36.) Defendants frame the issue more narrowly, emphasizing that officials were confronted with ambiguous language that could be interpreted as violent, student and employee safety concerns, alleged disruption to the learning environment, and a later-discovered Instagram video of Lemoine firing a handgun that caused officials to question her earlier explanation of the Snapchat message. (DE 45 at 2–4, 9–16, 33–34.)

By September 2024, several principles were clearly established. Public college students retain First Amendment protections when they enroll in a public institution; state colleges and universities are not "enclaves immune from the sweep of the First Amendment," and First Amendment protections do not apply "with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. at 180–81. A public college may not punish student expression merely because it disagrees with the ideas expressed or because the expression is offensive to good taste or inconsistent with conventions of decency. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670–71 (1973). Under *Tinker*, a school may not restrict student speech based on "undifferentiated fear or apprehension of disturbance" or a mere desire to avoid discomfort from an unpopular viewpoint. 393 U.S. 503, 508–09 (1969). And although schools retain some authority to regulate off-campus speech in circumstances implicating school interests, *Mahanoy* made clear that a school's interest in punishment is diminished when the speech occurs outside school hours,

36

away from school, through a personal social-media account, and does not identify the school or target members of the school community. 594 U.S. 180, 188–91 (2021).

It was also clearly established that true threats fall outside First Amendment protection, but only when the speech constitutes a serious expression of intent to commit unlawful violence against a particular individual or group. *See Virginia v. Black*, 538 U.S. at 359. By the time of the events in this case, *Counterman* further confirmed that true-threat analysis requires attention to the speaker's mental state and, at minimum, proof that the speaker consciously disregarded a substantial risk that the communication would be viewed as threatening violence. 600 U.S. at 69, 79–82.

These authorities gave reasonable officials fair warning that they could investigate reported safety concerns and take reasonable temporary steps to assess potential danger or disruption. They also clearly established the governing limits on formal discipline for off-campus student expression: absent a true threat, actual substantial disruption, or a reasonable forecast of substantial disruption grounded in facts, a public educational institution may not punish protected expression. The qualified-immunity question therefore turns on what each individual defendant knew, what each defendant did, and whether, in light of that defendant's own conduct, existing law made the unlawfulness of the conduct apparent.

### b.    Batten

Batten is not entitled to qualified immunity on the individual-capacity First Amendment claim. Unlike Fore, Batten personally participated in the investigation

and disciplinary process leading to the interim suspension, no-trespass order, September 20 conduct decision, and appeal process. Defendants identify Batten as the Vice President of Student Affairs responsible for investigating student concerns and implementing discipline when necessary. (DE 45 at 6.) Defendants also acknowledge that Batten met with Lemoine after concerns arose about the Snapchat message, later requested Fore's approval for an interim suspension, and met with Lemoine again about the Instagram video. (DE 45 at 2–4, 6.)

The record, viewed in Lemoine's favor, shows that Batten and Sawyer met with Lemoine on September 11 regarding the Snapchat message. During that meeting, Lemoine denied that "blasted" referred to physical harm and explained that she meant the person should be called out or held accountable. (DE 44-3; DE 45-5.) The September 20 conduct decision later recounted that Lemoine was told at the conclusion of the September 11 meeting that "there was no evidence to find [her] in violation of the Student Code" and that HGTC "had accepted [her] explanation for the Snapchat comment." (DE 44-3; DE 45-5.)

The record also contains evidence that, after the September 11 meeting, Sawyer emailed Batten and others that "there has been no direct threat to others." (DE 44-1 at 3; DE 44-4 at 26; DE 45-2 at 2.) Plaintiff further cites evidence that, after additional interviews, Batten and Sawyer again concluded there was no direct threat and that Batten told Strong there was no evidence to find Lemoine in violation of the Student Code. (DE 44-3; DE 44-4; DE 45-5.) Defendants dispute the significance of those facts and emphasize that students and employees expressed discomfort, safety

concerns, and concerns about classroom disruption. (DE 45-1; DE 45-2; DE 45-3; DE 45-7; DE 45-8.) But the record shows that Batten knew Lemoine had denied any violent meaning, knew HGTC had initially accepted that explanation, and knew the Snapchat message concerned an off-campus dispute involving a nonstudent.

After the September 11 meeting, Batten received a screen recording of the Instagram video from Audrey Heisler, at which point Batten requested Fore's approval for an interim suspension. (DE 45-2 at 6; DE 45-3 at 7; DE 45-4.) Defendants contend the video caused Batten to question Lemoine's original explanation of the term "blasted" and her statements concerning firearms. (DE 45-16 at 4–5.) But Plaintiff cites evidence that the video was posted in November 2023, before Lemoine enrolled at HGTC, and that it showed target shooting away from campus. (DE 44-15; DE 45-2.) Plaintiff also cites Batten's testimony that the video itself contained no threat, made no reference to HGTC, and that HGTC had no rule prohibiting a student from firing a gun. (DE 44-4 at 21–24.) Batten also testified that neither the Snapchat message alone nor the Instagram video alone violated the Student Code. (*Id.* at 23–24.)

Batten also participated in the September 17 meeting, at which Lemoine acknowledged the video, stated that the video was from around Thanksgiving 2023, explained that the gun did not belong to her, stated that it was the only time she had fired a gun, and offered to allow HGTC to search her belongings. (DE 44-12 at 6–7; DE 44-17; DE 45-2 at 6–7.) The September 20 conduct decision then disciplined Lemoine based on the Snapchat message and Instagram video. (DE 44-3; DE 45-5.)

39

Plaintiff further cites Batten's testimony that Batten and Sawyer drafted the September 20 conduct decision letter together. (DE 44-4 at 32–34; *see also* Batten Dep. 121:14–17.)

Under Lemoine's version of the facts, Batten knew that the Snapchat message concerned a nonstudent and off-campus personal matter; knew that Lemoine denied any violent meaning; knew that HGTC had initially accepted that explanation; knew that the Instagram video was old, lawful target-shooting activity and did not mention HGTC; knew that Lemoine offered to allow a search of her belongings; and nevertheless participated in imposing formal discipline based on those two items of speech. A reasonable official who personally participated in imposing discipline with that knowledge would have understood that suspending a public college student and excluding her from campus for off-campus expression, without a true threat or evidence of substantial disruption, violated the First Amendment.

Defendants emphasize that Batten acted in response to safety concerns and that some students and employees expressed that they felt uncomfortable or unsafe. (DE 45 at 11–16.) The Court does not minimize those concerns. But qualified immunity does not turn on whether Batten was permitted to investigate. She was. The relevant question is whether Batten could reasonably participate in imposing discipline after the investigation revealed no serious expression of intent to commit unlawful violence toward the HGTC community, no school-directed threat, no weapon on campus, no refusal to cooperate, and no actual or reasonably forecast substantial

disruption sufficient under *Tinker* and *Mahanoy*. On the facts viewed in Lemoine's favor, she could not.

Accordingly, Batten is not entitled to qualified immunity on the individual-capacity First Amendment claim. Defendants' motion for summary judgment is denied as to Batten's qualified-immunity defense on that claim.

### c.    Sawyer

Sawyer is likewise not entitled to qualified immunity on the individual-capacity First Amendment claim. Defendants identify Sawyer as HGTC's Director of Student Development. The record shows that Sawyer participated in the September 11 meeting with Lemoine about the Snapchat message, participated in the investigation, interviewed students, and drafted and issued the September 20 conduct decision letter. (DE 45-2 at 2; DE 44-3; DE 45-3; DE 45-5; DE 44-4 at 32–34)

Sawyer's personal role is significant because she issued the September 20 conduct decision letter suspending Lemoine and imposing the no-trespass order. (DE 44-3; DE 45-5.) That letter expressly relied on the Snapchat message and Instagram video. It stated that HGTC had accepted Lemoine's explanation for the Snapchat comment at the September 11 meeting but later concluded that the Instagram video caused HGTC to question that explanation, caused apprehension related to guns, and impacted the learning environment because students and employees expressed that they felt unsafe. (DE 44-3; DE 45-5.)

The September 20 letter did not identify any independent nonspeech misconduct as the basis for discipline. It did not state that Lemoine possessed a

41

weapon on campus, refused to cooperate, threatened an HGTC student or employee, or engaged in conduct separate from the Snapchat message and Instagram video. Rather, the formal disciplinary finding rested on the perceived meaning and effect of those two items of expression. (DE 44-3; DE 45-5.)

Under Lemoine's version of the facts, Sawyer knew substantially the same context as Batten. Sawyer participated in the September 11 meeting in which Lemoine denied that "blasted" referred to physical harm and explained that she meant the person should be held accountable or called out for his behavior. (DE 45-2 at 2; DE 45-3 at 2–7; DE 44-3; DE 45-5.) After that meeting, Sawyer emailed Batten and others that "there has been no direct threat to others." (DE 44-11 at 3; DE 44-4 at 26; DE 45-2 at 2.) Plaintiff also cites Sawyer's interview notes reflecting that one student stated she "does not feel threatened or scared" by the Snapchat interaction and that another student described Lemoine as emotional but "not intentionally going to hurt anyone." (DE 49-1 at 2–3.) Sawyer also stated in her deposition that she was aware of other uses of the term "blasted," and that there was no direct threat made to anyone in the Snapchat message. (DE 44-31 at 22:18–30:1.) Plaintiff further cites evidence that Sawyer knew the Instagram video was old, did not reference HGTC, and was not seen by Lemoine's classmates or professors before HGTC discovered it. (DE 49-1 at 8; DE 44-15;; DE 44-31 at 92:5–94:7, 104:20–24.)

Defendants argue that Sawyer reasonably assisted in responding to a potential safety issue and student concerns. That argument explains why Sawyer could investigate. It does not entitle Sawyer to qualified immunity for issuing the formal

disciplinary decision on this record. By September 20, the facts known to Sawyer, viewed in Lemoine's favor, showed off-campus expression about a nonstudent, an accepted nonviolent explanation, an old target-shooting video with no HGTC reference, and no actual or reasonably forecast substantial disruption sufficient to support discipline under the First Amendment.

As with Batten, Sawyer's concern for campus safety does not alter the clearly established analysis. Campus safety concerns merely justified inquiry and temporary assessment. But a generalized invocation of safety, without a true threat or evidence of substantial disruption, did not make it objectively reasonable to discipline Lemoine for protected off-campus expression. *See Tinker*, *Healy*, *Papish*, *Mahanoy*, *Black*, and *Counterman* provided fair warning that the First Amendment required more.

Accordingly, Sawyer is not entitled to qualified immunity on the individual-capacity First Amendment claim. Defendants' motion for summary judgment is denied as to Sawyer's qualified-immunity defense on that claim.

### d.    Fore

Fore's qualified-immunity analysis is *different* because her personal role was materially narrower than Batten's and Sawyer's. Fore was HGTC's President. The record reflects that Batten presented Fore with information concerning the Snapchat message and Instagram video before the interim suspension, and that Fore authorized the interim suspension. (Fore Dep. 11:24–25:14, DE 44-2; DE 45-4.) Sawyer likewise testified that Fore had to authorize the interim suspension and that

43

the interim suspension removed Lemoine from HGTC. (Sawyer Dep. 100:24–101:8, DE 44-31.)

Plaintiff cites evidence that Fore's role was not nonexistent. Fore testified that Batten presented her with the Snapchat message and Instagram video before the interim suspension. (Fore Dep. 11:24–25:14, DE 44-2.) Fore also testified that Batten and Sawyer discussed the yearlong suspension with her beforehand and that she agreed with it. (Fore Dep. 25:1–4, DE 44-2.) The Court accepts those facts for purposes of the qualified-immunity analysis.

Even accepting Plaintiff's evidence, Fore's role remained materially different from the roles of Batten and Sawyer. Fore did not conduct the September 11 interview, did not interview students or instructors, did not meet with Lemoine on September 17, did not draft or issue the September 20 conduct decision, and did not conduct the appeal hearing. The September 20 decision was issued by Sawyer. (DE 44–3; DE 45–5.) Plaintiff cites evidence that Batten and Sawyer drafted that letter together. (Batten Dep. 121:14–17, DE 44-4 at 32–34.) Defendants also cite Fore's testimony that, after authorizing the interim suspension, she had limited involvement, did not review the conduct decision letter after the initial appeal, and did not approve the procedures for how the hearing committee was run. (Fore Dep. 26:8–25, DE 53 at 13.)

The record also reflects that Lemoine did not pursue the final appeal to Fore after the hearing committee issued its decision. The appeal decision informed Lemoine that she could appeal to the College President by October 21, 2024. (DE 45-

44

9 at 19.) Lemoine testified that she did not appeal because she believed there was no reason to do so and assumed Fore would reach the same decision. (Lemoine Dep. 119:11–120:22, DE 45-9.) Thus, although Fore may have authorized the interim suspension and agreed with the yearlong suspension before it was issued, the record does not show that Fore personally conducted the investigation, personally made the factual findings in the September 20 letter, personally questioned Lemoine, or personally adjudicated a final appeal.

On this record, Fore is entitled to qualified immunity on the individual-capacity First Amendment claim. The Court has concluded that HGTC's discipline violated the First Amendment. But qualified immunity asks a different question: whether it would have been clear to every reasonable official in Fore's position that authorizing or approving an interim suspension and later discipline, based on safety-framed information presented by the student-affairs officials responsible for the investigation, violated Lemoine's clearly established rights. Given Fore's more limited and derivative role, the evolving factual assessment at the time of the interim suspension, and the absence of evidence that Fore personally investigated the facts, authored the disciplinary rationale, or adjudicated the final appeal, the Court cannot say that Fore's individual conduct violated clearly established law in a manner that was beyond debate.

This conclusion does not rest on the lawfulness of HGTC's discipline. Nor does it immunize supervisory officials whenever they approve a subordinate's recommendation. Rather, it reflects the defendant-specific nature of qualified

immunity and § 1983 individual liability. Fore cannot be held personally liable merely because she was HGTC's President or because she supervised Batten and Sawyer. *See Iqbal*, 556 U.S. at 676. The record must show that Fore, through her own conduct, violated clearly established law. On the present record, the Court cannot conclude that Fore's approval role, as distinct from the investigative and disciplinary actions of Batten and Sawyer, was clearly established as unconstitutional.

Accordingly, Fore is entitled to qualified immunity on Lemoine's individual-capacity First Amendment damages claim. Defendants' motion for summary judgment is granted as to Fore on that claim, and Lemoine's motion is denied to that extent.

## C.     Procedural Due Process

Lemoine also contends that Defendants violated the Fourteenth Amendment's Due Process Clause by suspending her, imposing a no-trespass order, and upholding discipline through an appeal process that allegedly failed to provide the identities of the persons bringing charges, the substance of the evidence supporting HGTC's disruption and safety rationale, and the process promised by HGTC's Student Code. Defendants respond that Lemoine received notice of the grounds for discipline, multiple opportunities to respond, a written conduct decision, an appeal hearing before a committee, and notice of another appeal to the College President.

### 1.     Governing Law

The Fourteenth Amendment prohibits a State from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV. A procedural

due process claim therefore requires a plaintiff to identify a protected liberty or property interest, show that the State deprived her of that interest, and show that the procedures used were constitutionally inadequate. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999); *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976).

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. The process due in a particular case is flexible and depends on the particular situation. *Id.* at 334. Courts generally consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

In the student-discipline context, *Goss v. Lopez* provides the starting point. 419 U.S. 565 (1975). *Goss* held that students facing suspension from a public school have protected property and liberty interests and must receive "some kind of notice" and "some kind of hearing." *Id.* at 579. For a suspension of ten days or less, due process requires "oral or written notice of the charges[,]" and, if the student denies them, "an explanation of the evidence" school officials have and an opportunity for the student to present her side of the story. *Id.* at 581. Ordinarily, notice and an opportunity to respond should precede removal, but immediate removal may be justified where the student's presence endangers persons or property or threatens disruption of the academic process; in that circumstance, the necessary notice and hearing should

47

follow as soon as practicable. *Id.* at 582–83. This case involves a public technical college and discipline that initially excluded Lemoine from campus and in-person participation for longer than the short suspension addressed in *Goss*. The Court therefore considers *Goss's* minimum requirements together with the flexible *Mathews* framework. Longer suspensions may require more formal procedures than the informal process approved in *Goss*, but due process in the student-disciplinary setting still does not require a full judicial trial in every case. *See Goss*, 419 U.S. at 583–84; *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 630 (4th Cir. 2002); *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 – 86 (1978) (holding that *Goss* does not require some type of formal hearing where a student could defend themselves, but an "informal give-and-take" between the student and the administrative where the student has the opportunity to characterize her conduct and put in context).

Nor does the Constitution transform every alleged deviation from an institutional handbook into a federal due process violation. *See Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990). Institutional procedures may inform the Court's analysis and may be relevant to the reasonableness of the process provided. But the federal constitutional question remains whether the procedures actually provided gave Lemoine notice, an explanation of the evidence, and a meaningful opportunity to respond before she was finally deprived of a protected interest.

48

### 2.     Protected Interest

The Court assumes, without deciding, that Lemoine had a protected property interest in continued participation in HGTC's cosmetology program and a related liberty interest sufficient to trigger procedural due process protections. HGTC is a public institution, and the discipline at issue excluded Lemoine from campus, interrupted her ability to participate in in-person cosmetology coursework, and created a disciplinary record. The September 20 conduct decision suspended Lemoine from HGTC until Fall 2025, imposed a no-trespass order, and stated that she would be placed on disciplinary probation if later permitted to reenroll. (DE 44-3; DE 45-5.) The appeal decision modified, but did not eliminate, those sanctions by restricting Lemoine to online classes through Spring 2025 and maintaining the no-trespass order until Summer 2025. (DE 5-5.)

Because the Court assumes that Lemoine had a protected interest, the dispositive question is whether the procedures provided were constitutionally adequate under the circumstances.

### 3.     Adequacy of Process

#### a.     Pre-Deprivation Process and Interim Suspension

The record shows that Lemoine received notice of the concerns and an opportunity to respond before the final September 20 conduct decision. On September 11, Batten and Sawyer met with Lemoine about the Snapchat message. During that meeting, Lemoine was asked about her use of the term "blasted," denied that it referred to physical harm, and explained that she meant the person should be called

out or held accountable. (DE 44-3; DE 45-5.) HGTC initially accepted that explanation and told Lemoine there was then no evidence to find her in violation of the Student Code. (*Id.*)

After HGTC discovered the Instagram video, Batten and Sawyer met with Lemoine again on September 17. At that meeting, Lemoine acknowledged that she was the person in the video, stated that the video was from around Thanksgiving 2023, explained that the gun did not belong to her, stated that it was the only time she had fired a gun, and offered to allow HGTC to search her belongings. (DE 45-2 at 6–7; DE 44-12 at 6–7.) HGTC then imposed an interim suspension and no-trespass order. (DE 5-3; DE 44-17 at 2.)

Lemoine argues that no emergency justified immediate removal because HGTC had already accepted her explanation and because the Instagram video was old, off campus, and did not reference HGTC. (DE 44-1 at 36–42; DE 49 at 33–35; DE 54 at 7–10.) The Court has accepted much of that argument in the First Amendment analysis. But procedural due process asks a different question. Even if the interim suspension was substantively unjustified, the record shows that Lemoine knew the two matters under investigation—the Snapchat message and the Instagram video—and had an opportunity to respond to both before the final conduct decision was issued. To the extent HGTC believed temporary removal was necessary while it assessed safety concerns, *Goss* recognizes that immediate removal may be justified where school officials perceive danger or disruption, so long as the necessary notice and hearing follow as soon as practicable. 419 U.S. at 582–83. Here, Lemoine received

50

a written conduct decision three days after the interim suspension, followed by an appeal hearing. (DE 44-3; DE 45-5; 44-18; 45-7.) Considering the timing, the safety concerns asserted by HGTC, and the later appeal process, the interim suspension did *not* violate procedural due process.

### b.    September 20 Conduct Decision

The September 20 conduct decision provided written notice of the charge, the evidence on which HGTC relied, the Student Code provision violated, the sanctions imposed, and the appeal process. (DE 44-3; DE 45-5.) The letter identified the Snapchat message using the term "blasted" and the Instagram video of Lemoine firing a handgun. It explained that the video caused HGTC to question Lemoine's earlier explanation of "blasted," stated that the combination of the message and video caused apprehension related to guns, and concluded that the circumstances had impacted the learning environment because students and employees expressed that they felt unsafe. (*Id.*)

Lemoine argues that the September 20 letter did not disclose the identities of the students or employees who expressed safety concerns, did not provide the evidence supporting HGTC's assertion that the learning environment was disrupted, and did not identify every person involved in bringing the charge. (DE 44-1 at 9–12, 41–42; DE 49 at 3–4; DE 54 at 2–3, 8–9.) Those arguments are relevant to whether HGTC followed its own Student Code and to whether HGTC's disruption rationale was substantively sufficient under the First Amendment. But the Due Process Clause required constitutionally adequate notice of the charge, an explanation of the

evidence, and a meaningful opportunity to respond. The September 20 letter gave Lemoine notice that HGTC was disciplining her based on the Snapchat message, the Instagram video, and HGTC's conclusion that these items posed safety concerns and caused disruption under the Student Code.

The Court therefore concludes that the September 20 conduct decision satisfied the federal constitutional requirement of written notice and explanation of the evidence.

### c.    Appeal Hearing

The appeal process provided additional procedural protection. Lemoine timely appealed the September 20 conduct decision. (DE 45-7.) On October 1, 2024, HGTC emailed Lemoine notice that the appeal hearing would occur on October 10, 2024. The notice included the hearing committee meeting notice, committee membership, agenda, and evidence to be presented. (DE 45-6.) The notice identified Batten as the person filing the complaint and listed her as an ex officio, non-voting member of the appeal committee. (*Id.*)

The Student Code provided that a student in an appeal hearing had the right to present witnesses, know the names of witnesses who may be called to testify, review available evidence that may be presented, know the identity of the person bringing the charges, and hear witnesses on behalf of the person bringing the charges. (DE 44-17 at 15–16.) Lemoine contends HGTC violated these provisions by structuring the hearing so that no students or instructors testified, thereby

preventing her from learning and challenging the identities and statements of those who allegedly expressed safety concerns.

The record supports Lemoine's concern that HGTC personnel discussed whether instructors should testify in Lemoine's presence. Before the hearing, Strong emailed Batten, Sawyer, and Fore that she had spoken with Heisler and that "none of us are comfortable with how the hearing is set up in fear of the student retaliating once she hears what the instructors have to say." (DE 44-20 at 3.) Strong also stated that, because the complaint related to potential violence and involved comments or discussion related to a gun, certain instructors were not comfortable providing statements directly to Lemoine or in her presence. (*Id.*)

But the record also shows that HGTC did not call those instructors, students, or any other witnesses at the appeal hearing. The evidence identified for the hearing was the Snapchat message and the Instagram video. (DE 44-21; DE 45-6.) Lemoine knew both items, had already responded to both items in meetings with HGTC officials, and had the opportunity to respond again at the hearing. The Hearing Committee affirmed the violation based on the Snapchat message considered together with the Instagram video but modified the sanction. (DE 5-5; DE 45-9.)

On these facts, the hearing process was not constitutionally deficient. The Constitution did not require HGTC to call witnesses against Lemoine, and because HGTC called no witnesses, Lemoine was not denied a constitutional right to confront or cross-examine witnesses who testified against her. Nor did clearly established due process principles require HGTC to provide every witness identity or every item of

investigative material where Lemoine had notice of the charge, knew the evidence on which HGTC proceeded, and had an opportunity to respond. To the extent HGTC failed to follow every procedure described in its Student Code, such failure does not, by itself, establish a federal due process violation. *See Riccio*, 907 F.2d at 1469.

The Court does not endorse HGTC's hearing design as a model disciplinary process. A more transparent process would have better separated factual investigation, charging, and adjudication, and would have more clearly identified whether HGTC was relying on witness statements, student complaints, or employee concerns as evidence of disruption. But the constitutional question is narrower. Considering the September 11 meeting, the September 17 meeting, the September 20 written decision, the October 1 hearing notice, the identified evidence, the October 10 hearing, the modified appeal decision, and the availability of another appeal, Lemoine received notice, an explanation of the evidence, and a meaningful opportunity to respond.

### d.    Further Appeal to Fore

The appeal decision advised Lemoine that she could appeal the Hearing Committee's decision to the College President by October 21, 2024. (DE 45-9 at 19.) Lemoine did not file that further appeal. She testified that she did not appeal because she believed there was no reason to do so and assumed Fore would reach the same decision. (Lemoine Dep. 119:11–120:22, DE 45–9.)

The Court does not treat the failure to pursue another appeal as an absolute bar to Lemoine's due process claim. But it is relevant to the adequacy of the overall

procedures available. Where a student receives notice, an explanation of the evidence, an opportunity to respond, an appeal hearing, and notice of another appeal but declines to pursue that further review, the available process weighs against finding a federal due process violation.

### 4.    Due Process Merits Disposition

For these reasons, the Court concludes that Defendants did not violate Lemoine's procedural due process rights. Lemoine received notice of the charge and the evidence on which HGTC proceeded, had opportunities to respond before and after the interim suspension, received a written conduct decision, appealed that decision to a hearing committee, and was advised of another appeal to the College President.

Lemoine's counterarguments do not alter that conclusion. She contends that HGTC failed to provide meaningful notice because it did not disclose the full basis for the disciplinary action, did not provide evidence of substantial disruption, did not identify the persons allegedly bringing charges or complaints against her, and created an ad hoc hearing process designed to withhold witnesses and evidence. (DE 44-1 at 9–12, 41–42; DE 49 at 3–4; DE 54 at 2–3, 8–9.) She also argues that requiring another appeal to Fore would have been futile because Fore was allegedly involved in creating or approving the challenged appeal process. (DE 54 at 3.)

Those concerns are not insignificant. They bear on the fairness and transparency of HGTC's process, and they overlap with the Court's conclusion that HGTC lacked a sufficient First Amendment basis to discipline Lemoine for the

Snapchat message and Instagram video. But procedural due process does not require a public educational institution to provide a trial-type hearing, call witnesses against the student, permit confrontation or cross-examination, disclose every item of investigative material, or perfectly follow every internal handbook provision. The constitutional question is whether Lemoine received notice of the charge, an explanation of the evidence on which HGTC relied, and a meaningful opportunity to respond.

She did. HGTC's written decision and appeal process made clear that the discipline rested on the Snapchat message, the Instagram video, and HGTC's conclusion that those items created safety concerns and disruption under the Student Code. Lemoine knew both items of evidence, responded to both before the September 20 decision, appealed the decision, and had another opportunity to respond at the hearing. HGTC called no witnesses at the hearing, and the evidence identified for the hearing was the Snapchat message and Instagram video. Thus, even if HGTC's process was imperfect or departed from the Student Code in the manner Lemoine contends, the procedures provided satisfied the federal constitutional minimum.[1]

Accordingly, Defendants' motion for summary judgment is granted as to Lemoine's procedural due process claim, and Lemoine's motion for summary judgment is denied as to that claim.

---

[1]     The Court refers here to the Student Code as part of the factual and procedural background. The federal due process question remains whether the procedures actually provided satisfied the constitutional minimum. *See* Riccio, 907 F.2d at 1469.

### 5. Individual-Capacity Due Process Claims and Qualified Immunity

Even if the record could support a procedural due process violation, Fore, Batten, and Sawyer would be entitled to qualified immunity on Lemoine's individual-capacity due process damages claims because the broader procedural rights Lemoine asserts were not clearly established in these circumstances.

#### a. Clearly Established Right

At the time of the challenged discipline, it was clearly established that a student facing suspension from a public educational institution must receive notice of the charges, an explanation of the evidence on which the school proceeds, and an opportunity to present her side of the story. *See Goss*, 419 U.S. at 581. Because this case involved discipline longer than the short suspension addressed in *Goss*, the Court also considers that baseline through the flexible *Mathews* framework, which asks whether the procedures provided afforded a meaningful opportunity to be heard in light of the interests at stake, the risk of erroneous deprivation, the value of additional safeguards, and the government's interest. *See Mathews*, 424 U.S. at 333–35.

Existing precedent did not clearly establish, however, that due process required a public technical college in these circumstances to provide the identities of every student or employee who expressed safety concerns, call those persons as witnesses, permit confrontation or cross-examination, disclose every item of investigative material, or comply with every procedural detail in its Student Code as

a matter of federal constitutional law. *See Tigrett*, 290 F.3d at 630; *Riccio*, 907 F.2d at 1469.

The clearly established right is therefore defined by the procedural protections recognized in *Goss* and applied through the flexible *Mathews* framework: notice of the charge, an explanation of the evidence on which the school proceeds, and a meaningful opportunity to respond before final deprivation of the protected interest. Because the record shows that Lemoine received that process, and because any broader procedural entitlement was not clearly established, Fore, Batten, and Sawyer are entitled to qualified immunity on the individual-capacity procedural due process claim.

### b.    Batten

Batten participated in the September 11 and September 17 meetings, requested authorization for the interim suspension, was listed as the person filing the complaint for purposes of the appeal hearing, and was listed as an ex officio, non-voting member of the appeal committee. (DE 45-2; DE 45-4; DE 45-6.) Lemoine argues that Batten's role blurred the line between investigator, complainant, and hearing participant.

Even accepting that characterization, Batten did not personally deprive Lemoine of clearly established due process rights. Lemoine had notice of the Snapchat message and Instagram video, had an opportunity to respond to both before the September 20 decision, received a written conduct decision, and appealed to a committee on which Batten did not vote. The Constitution did not clearly prohibit

58

Batten from investigating the allegations, presenting the complaint, or serving in a non-voting ex officio capacity. Batten is therefore entitled to qualified immunity on the individual-capacity due process claim.

### c.    Sawyer

Sawyer participated in the investigation and issued the September 20 conduct decision letter. (DE 44-3; DE 45-5.) Lemoine argues that Sawyer's decision letter relied on undisclosed student and employee concerns and failed to provide the factual basis for HGTC's disruption conclusion.

The September 20 letter, however, identified the charge, the Student Code provision, the Snapchat message, the Instagram video, HGTC's reasoning, the sanctions, and the appeal right. (*Id.*) Even assuming the explanation could have been more complete, it was not clearly established that due process required Sawyer to disclose every student or employee identity or every investigative statement where HGTC proceeded at the hearing on the Snapchat message and Instagram video and called no witnesses. Sawyer is therefore entitled to qualified immunity on the individual-capacity due process claim.

### d.    Fore

Fore's role was more limited. She authorized the interim suspension based on information presented by Batten and served as the potential final appellate authority under the Student Code. (DE 45-4; DE 45-9.) Lemoine did not pursue the final appeal to Fore. (DE 45-9.)

The record does not show that Fore personally conducted the investigation, issued the September 20 decision, structured the hearing, withheld evidence, or adjudicated an appeal. Because § 1983 individual liability requires personal involvement, and because no clearly established law placed every reasonable official on notice that Fore's limited approval and potential appellate role violated due process, Fore is entitled to qualified immunity on the individual-capacity due process claim.

Accordingly, Defendants' motion for summary judgment is granted as to the individual-capacity procedural due process claims against Fore, Batten, and Sawyer, and Lemoine's motion is denied as to those claims.

## D.     Remaining Remedies

Having resolved the parties' cross-motions as to liability, immunity, mootness, and qualified immunity, the Court next identifies the remedies that remain potentially available.

### 1.     Injunctive and Equitable Relief

Lemoine sought preliminary and permanent injunctive relief requiring HGTC to lift the no-trespass order and readmit her to the cosmetology program. (DE 1 at 27–29; DE 5.) The Court previously granted preliminary injunctive relief requiring HGTC to lift the no-trespass order and readmit Lemoine. (DE 15.) The record now reflects that Lemoine has completed her cosmetology hours, sat for the licensure examination, and obtained her cosmetology license. (DE 45 at 6.) For the reasons stated in the mootness section above, any request for injunctive relief requiring

readmission to the cosmetology program, in-person participation in coursework, or relief from the prior no-trespass order is moot to the extent those remedies have already been afforded or are no longer necessary.

The record is less clear as to whether other prospective or equitable relief remains available. Lemoine's Complaint seeks declaratory and injunctive relief for the challenged disciplinary actions and alleged continuing effects, and her summary-judgment briefing continues to assert that the suspension, no-trespass order, disciplinary finding, and appeal decision caused ongoing reputational, educational, and economic harm. (DE 1 at 27–29; DE 44-1 at 1–9, 41–42; DE 49 at 3–4, 35.) But the parties have not fully developed the current status of Lemoine's disciplinary record or whether the September 2024 disciplinary finding continues to produce concrete collateral consequences after completion of the cosmetology program and licensure.

That distinction matters for Article III purposes. Federal courts may grant prospective relief only where the plaintiff retains a legally cognizable interest in relief that would have a practical effect. *See Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70–72 (1983); *Norfolk S. Ry. Co.*, 608 F.3d at 161. If the September 2024 disciplinary finding, appeal decision, or related materials remain in Lemoine's educational record and continue to produce concrete collateral consequences, then prospective relief such as expungement, correction of records, or related equitable relief may remain live. *See Hardy*, 545 F.3d at 283–85. If, however, the challenged

61

disciplinary consequences have ended and no demonstrable continuing effect remains, then additional prospective relief may be moot. *See id.* at 285.

Because the parties have not adequately developed the current status of Lemoine's disciplinary record, any collateral consequences, or the precise form of equitable relief requested after completion of the cosmetology program and licensure, the Court will require limited supplemental briefing on that issue.

### 2.    Declaratory Relief

Lemoine also seeks declaratory relief. The Declaratory Judgment Act permits a federal court to declare the rights and legal relations of interested parties only "[i]n a case of actual controversy within its jurisdiction[.]" 28 U.S.C. § 2201(a). That requirement is coextensive with Article III. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41 (1937). A justiciable declaratory-judgment controversy must be "definite and concrete," must touch "the legal relations of parties having adverse legal interests," and must be "real and substantial" rather than hypothetical or abstract. *Id.* at 240–41. The controversy also must remain sufficiently immediate and real at the time declaratory relief is considered. *See Golden v. Zwickler*, 394 U.S. 103, 108–10 (1969).

Declaratory relief is not available merely to obtain an advisory opinion or to announce that a party acted unlawfully in the past where the declaration would have no practical effect on the parties' legal rights. *See Green v. Mansour*, 474 U.S. 64, 73–74 (1985); *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988); *Norfolk S. Ry. Co.*, 608 F.3d at161. The value of declaratory relief lies in resolving a live dispute that affects the parties'

conduct or legal relations; where a declaration would not affect the defendant's behavior toward the plaintiff or support meaningful relief, it risks becoming an advisory opinion. *See Rhodes*, 488 U.S. at 4.

The Court has concluded, for purposes of the parties' cross-motions for summary judgment, that the challenged discipline violated the First Amendment. That ruling resolves the liability issue. Whether a separate declaratory judgment remains appropriate depends on whether the challenged discipline continues to affect Lemoine concretely such that declaratory relief would clarify the parties' legal relations or support meaningful prospective relief.

If the September 2024 disciplinary finding, appeal decision, or related records continue to produce concrete collateral consequences, declaratory relief may remain appropriate in connection with prospective equitable relief such as expungement or record correction. *See Hardy*, 545 F.3d at 283–85. If no continuing consequence remains, however, a separate declaration that Defendants violated the First Amendment would add nothing practical to the Court's liability ruling and may be unnecessary or unavailable. *See Green*, 474 U.S. at 73–74; *Rhodes*, 488 U.S. at 4.

Accordingly, the Court will include declaratory relief within the limited supplemental briefing addressed below.

### 3.    Damages

The Court's rulings substantially narrow the damages issues. Lemoine may not recover money damages from HGTC under § 1983 because, as an arm of the State, HGTC is not a "person" subject to damages liability under § 1983. *See Will v. Mich.*

63

*Dep't of State Police*, 491 U.S. 58, 64, 70–71 (1989). Nor may Lemoine recover money damages from Fore, Batten, or Sawyer in their official capacities because an official-capacity damages claim against a state official is, in all respects other than name, a claim against the State itself. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 169–70 (1985). State officials sued in their official capacities for damages also are not "persons" subject to damages liability under § 1983. *Will*, 491 U.S. at 71. The Court has also granted Defendants summary judgment on Lemoine's procedural due process claim, and Fore is entitled to qualified immunity on the individual-capacity First Amendment damages claim. Accordingly, no damages claim remains against HGTC, against any individual defendant in her official capacity, against Fore in her individual capacity, or against any defendant based on procedural due process.

The remaining damages claims are Lemoine's individual-capacity First Amendment claims against Batten and Sawyer. The Court has concluded that Lemoine established a First Amendment violation and that Batten and Sawyer are not entitled to qualified immunity on that claim. Lemoine seeks nominal damages, compensatory damages, and punitive damages against the individual defendants. Nominal damages are available to redress a completed violation of a legal right even without proof of actual compensatory injury. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 292–93 (2021); *see also Carey v. Piphus*, 435 U.S. 247, 266–67 (1978). Compensatory damages under § 1983 are available only for actual injury caused by the constitutional violation. *See Carey*, 435 U.S. at 254–64. They may not be awarded based on the abstract value or importance of the constitutional right violated, even

64

where the claim involves a substantive constitutional right such as the First Amendment. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307–10 (1986). Punitive damages under § 1983 may be available against individual defendants if the plaintiff proves that the defendant's conduct was motivated by evil motive or intent or involved reckless or callous indifference to federally protected rights. *Se Smith v. Wade*, 461 U.S. 30, 56 (1983).

The present summary-judgment record does not permit the Court to determine the amount of compensatory damages, if any, or whether punitive damages are warranted against Batten or Sawyer. Those issues remain for further proceedings unless otherwise resolved.

### 4.    Attorneys' Fees and Costs

Lemoine also seeks attorneys' fees and costs. Any request for attorneys' fees and taxable costs shall be addressed after entry of final judgment through the procedures provided by the Federal Rules of Civil Procedure, the Local Civil Rules, and any applicable statute.

### 5.    Supplemental Briefing on Prospective Relief

Within fourteen days of this Order, the parties shall file simultaneous supplemental briefs, not to exceed ten pages, addressing whether any declaratory relief or prospective equitable relief, including injunctive relief, expungement, record correction, or related relief, remains live and available in light of Lemoine's completion of the cosmetology program, receipt of licensure, the status of the September 2024 disciplinary record, and the status of any related Spring 2025

65

disciplinary proceedings. The parties shall file simultaneous responses, not to exceed five pages, within seven days thereafter. The supplemental briefing shall not address First Amendment liability, procedural due process liability, Eleventh Amendment immunity, or qualified immunity except to the extent necessary to explain the availability of prospective relief.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (DE 44) is GRANTED IN PART and DENIED IN PART, and Defendants' Motion for Summary Judgment (DE 45) is GRANTED IN PART and DENIED IN PART. Specifically, the Court rules as follows:

1. Defendants' Motion for Summary Judgment is GRANTED to the extent Defendants seek dismissal of all money-damages claims against HGTC and all official-capacity money-damages claims against Fore, Batten, and Sawyer under the Eleventh Amendment and § 1983.

2. Defendants' Motion for Summary Judgment is GRANTED to the extent Defendants contend that Lemoine's requests for readmission to the cosmetology program, in-person coursework access, and relief from the prior no-trespass order are moot.

3. Plaintiff's Motion for Summary Judgment is GRANTED as to the First Amendment merits to the extent set forth in this Order. The Court concludes that the challenged discipline violated the First Amendment. Defendants' Motion for Summary Judgment is DENIED as to the First Amendment merits.

4. Defendants' Motion for Summary Judgment is DENIED as to Batten's and Sawyer's qualified-immunity defenses to Lemoine's individual-capacity First Amendment damages claims.

5. Defendants' Motion for Summary Judgment is GRANTED as to Fore's qualified-immunity defense to Lemoine's individual-capacity First Amendment damages claim. Plaintiff's Motion for Summary Judgment is DENIED as to Fore in her individual capacity.

6. Defendants' Motion for Summary Judgment is GRANTED as to Lemoine's procedural due process claim. Plaintiff's Motion for Summary Judgment is DENIED as to that claim.

7. Defendants' Motion for Summary Judgment is GRANTED as to the individual-capacity procedural due process claims against Fore, Batten, and Sawyer on qualified-immunity grounds.

8. The Court RESERVES ruling on whether any declaratory relief or prospective equitable relief, including injunctive relief, expungement, record correction, or related relief, remains live and available. The parties shall submit supplemental briefing on that issue as set forth above.

After this Order, the issues remaining for further proceedings are Lemoine's individual-capacity First Amendment damages claims against Batten and Sawyer, including nominal damages and any compensatory or punitive damages that may be proven, and any declaratory or prospective equitable relief the Court determines remains live and available after supplemental briefing.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
August 10, 2026

67